**O. Leon WOOD a/k/a Leon Wood, Plaintiff,**

**v.**

**NATIONAL BASKETBALL ASSOCIATION, an unincorporated association comprised of Atlanta Hawks, Boston Celtics, Chicago Bulls, Cleveland Cavaliers, Dallas Mavericks, Denver Nuggets, Detroit Pistons, Golden State Warriors, Houston Rockets, Indiana Pacers, Kansas City Kings, Los Angeles Clippers, Los Angeles Lakers, Milwaukee Bucks, New Jersey Nets, New York Knicks, Philadelphia 76ers, Phoenix Suns, Portland Trail Blazers, San Antonio Spurs, Seattle Supersonics, Utah Jazz, Washington Bullets, The National Basketball Players Association and the Philadelphia 76ers Basketball Club, Inc., Defendants.**

**No. 84 Civ. 6582 (RLC).**

United States District Court, S.D. New York.

Oct. 25, 1984.

Elliott H. Pollack, Attorney for Plaintiff, New York City, for plaintiff; Fred L. Slaughter, of counsel.

Proskauer, Rose, Goetz & Mendelsohn, New York City, for NBA and Philadelphia 76ers; Jeffrey A. Mishkin, James H. Aibel, Gary B. Bettman, Gen. Counsel, NBA, New York City, of counsel.

Weil, Gotshal & Manges, New York City, for defendant Nat. Basketball Players Ass'n; James W. Quinn, Jeffrey S. Klein, Joel C. Schochet, New York City, of counsel.

## OPINION

ROBERT L. CARTER, District Judge.

Leon Wood, a talented college basketball player, and a member of the United States basketball team that won the gold medal in the Olympic games this past August in Los Angeles, has brought this action alleging that the National Basketball Association's ("NBA") college draft, maximum team salary rules and ban on player corporations constitute violation of section 1 of the Sherman Act, 15 U.S.C. § 1. Plaintiff seeks a preliminary injunction barring enforcement of the 1983 memorandum of understanding between the NBA and the NBA Players Association ("Players Association") pursuant to which the maximum team salary limitation was imposed, restraining defendants from refusing to deal with a corporation formed by plaintiff and outlawing the college draft as illegal restraints under the Sherman Act.

Plaintiff was selected by the Philadelphia 76ers Basketball Club ("Philadelphia") in the NBA annual college draft on June 19, 1984. Thereafter, Philadelphia and Wood's representative, Fred L. Slaughter, began negotiations. No agreement was reached, and plaintiff was offered a one year contract at $75,000. Patrick Williams, Vice President and General Manager of Philadelphia, states in his affidavit filed in this

case that the contract was offered to Wood not because of the limitations of the 1983 memorandum agreement, but to preserve Philadelphia's exclusive right to negotiate with Wood pursuant to NBA regulations now operative in re rookie players. Williams asserts that Philadelphia was prepared to seek a way around the salary cap in order to negotiate a multi-year contract with Wood but could not get Slaughter to work out the terms.

Plaintiff has declined to accept the one year $75,000 offer. Plaintiff contends that he is suffering irreparable injury in being required either to sign a one year contract with Philadelphia at a level far below his value in an open market or forego playing basketball in the NBA for one season. He alleges that in signing at a salary not commensurate with his talents he would be exposing himself to a career ending injury. He urges the court to grant him preliminary relief requiring Philadelphia to negotiate with plaintiff unfettered by the restrictions the college draft, salary cap and bar on player corporations impose.

A brief summary of the facts and transactions leading to the allegedly illegal NBA practices and procedures may help inform understanding. In 1970 a group of NBA players instituted an antitrust suit against the NBA challenging the reserve clause which gave one club the exclusive rights to the services of a player, the reserve compensation clause, college draft and other player allocation devices which the players alleged restricted competition. The litigation was pursued as a class action on behalf of all present NBA players and all those who would become NBA players prior to final judgment. The class plaintiffs were represented by the NBA Players Association, a defendant here.

On April 29, 1976, a settlement was reached after extensive arms-length negotiations between the NBA representatives, and representatives of the players which included the General Counsel of the Players Association and several named plaintiffs in the action. The settlement agreement eliminated the reserve clause, phased out the reserve compensation clause, modified the college draft, provided a $4.6 million settlement fund, and established machinery for judicial oversight of enforcement and implementation of the terms of the settlement. The settlement agreement was approved by this court, and the Court of Appeals. *Robertson v. NBA*, 72 F.R.D. 64 (S.D.N.Y.1976) (Carter, J.), *aff'd*, 556 F.2d 682 (2d Cir.1977).

In 1983 the *Robertson* agreement was modified by a memorandum of understanding. Again, agreement was reached through intensive arms-length negotiations between representatives of the NBA and the Players Association. The agreement imposed a maximum and minimum team salary limitation. Each team is required through the 1986–87 playing seasons to pay in players' salaries and benefits at a minimum a certain percentage of overall NBA gross revenues projected for each upcoming playing season. Conversely, no team will be permitted to exceed in players' salaries and benefits a certain specified percentage of NBA annual gross revenues. In no case, however, will the salary cap be set below $3.6 million in the 1984–85 playing season, $3.8 million in 1985–86 playing season or $4.0 million in the 1986–87 playing season. The agreement allows for flexibility so that clubs who have reached the maximum salary limitations are able to exceed it to sign rookies, to replace retired or injured players and to sign veteran free agents. The memorandum of understanding was incorporated into a modification agreement pursuant to which the *Robertson* agreement remains in full effect except as expressly affected by the modification agreement. The modification agreement was presented to the court with a joint request by the NBA and the Players Association for court approval. On May 9, 1983, the court scheduled a hearing to determine whether the new agreement was fair, reasonable and adequate, and on June 13, 1983, filed a supplemental judgment in *Robertson* approving the agreement.

■ At the outset of our inquiry, it must be noted that the college draft as it now

operates has been approved by this court and the Court of Appeals. The modification agreement with its maximum salary cap has been approved by this court. While the court's function when presented with a settlement of class action litigation is not to decide the merits of the controversy, *In re Traffic Executive Association-Eastern Railroad*, 627 F.2d 631, 633 (2d Cir.1980), it must determine whether the settlement is fair, reasonable and adequate, *Weinberger v. Kendrick*, 698 F.2d 61, 73 (2d Cir.1982), *cert. denied,* — U.S. —, 104 S.Ct. 77, 78 L.Ed.2d 89 (1983), and, moreover, must be satisfied that the settlement protects the rights and interest of absent members of the class. *Vulcan Society of Westchester County, Inc. v. Fire Department of the City of White Plains,* 505 F.Supp. 955, 961 (S.D.N.Y.1981) (Sofaer, J.). That an agreement containing features that violated federal antitrust laws would be approved at two levels of the judiciary is exceedingly unlikely.

■ The provisions under attack, the college draft and the maximum salary limitations, were, as indicated, the product of arms-length bargaining. The maximum team salary limitation clearly falls within the definition of terms and conditions of employment which are pursuant to § 8(d) of the National Labor Relations Act, 29 U.S.C. § 158(d), mandatory subjects of collective bargaining. *NLRB v. Wooster Division of Borg-Warner Corp.,* 356 U.S. 342, 78 S.Ct. 718, 2 L.Ed.2d 823 (1958); *American Federation of Musicians v. Carroll,* 391 U.S. 99, 88 S.Ct. 1562, 20 L.Ed.2d 460, *reh. denied,* 393 U.S. 902, 89 S.Ct. 64, 21 L.Ed.2d 189 (1968) (price floors for musicians were sufficiently related to the wages of employees to be a mandatory subject of bargaining); *Local 24, IBT v. Oliver,* 358 U.S. 283, 303–04, 79 S.Ct. 297, 308–09, 3 L.Ed.2d 312 (1959) (minimum rentals to be paid for use of equipment of owner-drivers were sufficiently related to the wages received by owner-drivers to be a mandatory subject of bargaining); *Murphy Tugboat v. Shipowners & Merchants Towboat Co., Ltd.,* 467 F.Supp. 841, 856 (N.D.Cal.1979), *aff'd,* 658 F.2d 1256 (9th Cir.1981), *cert. denied,* 455 U.S. 1018, 102 S.Ct. 1713, 72 L.Ed.2d 135 (1982) (ceiling on port pilotage charges sufficiently related to wages received by employees to be within the definition of terms and conditions of employment.).

Similarly, the college draft constitutes a mandatory subject of collective bargaining since such rules determine the team which has exclusive rights to a player. In their original form in professional sports such rules severely circumscribed the movement of players from one team to another and operated to limit the leverage players might exert on owners to upgrade their salaries. *See e.g., Mackey v. National Football League,* 543 F.2d 606, 615 (8th Cir.1976), *cert. dismissed,* 434 U.S. 801, 98 S.Ct. 28, 54 L.Ed.2d 59 (1977); *Smith v. Pro Football,* 420 F.Supp. 738, 743 (D.D.C. 1976), *aff'd in part and rev'd in part on other grounds,* 593 F.2d 1173 (D.C.Cir. 1978).

The antitrust claim as to the college draft and the maximum salary limitation must fail. Both provisions affect only the parties to the collective bargaining agreement—the NBA and the players—involve mandatory subjects of bargaining as defined by federal labor laws, and are the result of bona fide arms-length negotiations. Both are proper subjects of concern by the Players Association. As such these provisions come under the protective shield of our national labor policy and are exempt from the reach of the Sherman Act. *See Mackey v. National Football League, supra,* 543 F.2d at 614–15. (In that case the court set out the above three requirements for labor exemption distilled from *United Mine Workers of America v. Pennington,* 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965); *Meat Cutters v. Jewel Tea,* 381 U.S. 676, 85 S.Ct. 1596, 14 L.Ed.2d 640 (1965); *Connell Co. v. Plumbers & Steamfitters,* 421 U.S. 616, 95 S.Ct. 1830, 44 L.Ed.2d 418 (1975), and cognate cases.) *See also McCourt v. California Sports, Inc.,* 600 F.2d 1193, 1197–98 (6th Cir.1979) adopting *Mackey.*

Plaintiff places great stress on the fact that he is a "non-veteran NBA player and was not within the bargaining unit represented by the defendant Players Association" (Plaintiff's Memorandum at 17). He argues that "any condition relating to the wages of an unrepresented non-union member cannot be a mandatory subject matter of collective bargaining." *Id.* at 19. What plaintiff is contending is that since he was not an NBA player when the union and owners reached agreement on the issues in contention here, that agreement cannot bind him. He cites no authority for that proposition, and indeed none can be found. To adopt plaintiff's principle would turn federal labor policy on its head. The Players Association is the recognized exclusive bargaining agent for NBA players. Art. XXIII of the October 10, 1980 Agreement. At the time an agreement is signed between the owners and the players' exclusive bargaining representative, all players within the bargaining unit and those who enter the bargaining unit during the life of the agreement are bound by its terms. *J.I. Case Co. v. NLRB*, 321 U.S. 332, 335, 64 S.Ct. 576, 579, 88 L.Ed. 762 (1944) (when an employee is hired after the collective bargaining agreement has been made, "the terms of [his] employment already have been traded out"); *NLRB v. Laney and Duke Storage Warehouse Co.*, 369 F.2d 859, 866 (5th Cir.1966) ("[t]he duty to bargain is a continuing one, and a union may legitimately bargain over wages and conditions of employment which will affect employees who are to be hired in the future").

Indeed the law could be no other way. The aim of federal labor policy is to promote peace in labor-management relations, not chaos and turmoil which adoption of plaintiff's theory would produce. The Players Association has been acting as collective bargaining representative of NBA basketball players at least since the *Robertson* litigation commenced in 1970. It has bargained with owners on behalf of the players and has entered into a number of collective bargaining agreements binding the players including the agreement at issue here. The current agreement as to salary cap, college draft and ban on private player corporations is not due to expire until June 1, 1987. It is binding on plaintiff and all others now in the bargaining unit and all who hereafter enter the bargaining unit prior to the expiration date of the agreement—June 1, 1987.

The ban on private corporations is a part of the collective bargaining agreement. The ban on player corporations was agreed to in the words of Players Association General Counsel, because "[t]hese individual corporations created administrative entanglements and accounting difficulties for the benefit plans established and administered by the Players Association and the NBA." (Affidavit of Laurence Fleisher at 13). The ban arguably affects the terms and conditions of employment and could, therefore, fit the definition of mandatory subject of bargaining. Even if outside that definition, however, the ban presents no antitrust issues. It is a restriction agreed to in labor-management negotiations to simplify the union and NBA task of administering player benefits. Even though it may have an adverse impact on some individuals in the bargaining unit, *NLRB v. Allis-Chalmers Mfg. Co.*, 388 U.S. 175, 87 S.Ct. 2001, 18 L.Ed.2d 1123, *reh. denied*, 389 U.S. 892, 88 S.Ct. 13, 19 L.Ed.2d 202 (1967), it is not the proper subject of attack in proceedings seeking relief from antitrust violations.

The applicable standard for a grant of preliminary injunctive relief in this circuit is an unequivocal establishment of irreparable injury and either (1) the likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and the balance of hardships tipping decidedly in favor of the party seeking relief. *Jackson Dairy Inc. v. H.P. Hood & Sons*, 596 F.2d 70 (2d Cir.1979). We need not tarry long in discussing this issue. Plaintiff cannot meet that test. Previous discussion clearly shows that there is no likelihood of plaintiff succeeding on the merits or of showing that he has raised sufficiently serious questions to warrant their being tested in further litigation. Moreover, the de-

fendants are most at risk if injunctive relief is granted. The stabilization of the NBA financial status which the 1983 agreement sought to achieve would be undermined to the detriment of players and owners alike. Denial to plaintiff would only mean that he would have to negotiate with Philadelphia so that a contract can be produced under exceptions to the salary cap.

The most important basis for denial of preliminary relief, however, is that plaintiff has failed to show any irreparable harm. His complaint is about how much money he is to be paid for playing for Philadelphia. Money damages will adequately compensate him for whatever injury he has suffered. Such circumstances are not indicative of irreparable injury warranting preliminary relief. *Id.* at 72–73. The failure to show irreparable injury is fatal. Motion denied.

IT IS SO ORDERED.