**O. Leon WOOD a/k/a Leon Wood, Plaintiff-Appellant,**

**v.**

**NATIONAL BASKETBALL ASSOCIATION, an unincorporated association comprised of Atlanta Hawks, Boston Celtics, Chicago Bulls, Cleveland Cavaliers, Dallas Mavericks, Denver Nuggets, Detroit Pistons, Golden State Warriors, Houston Rockets, Indiana Pacers, Kansas City Kings, Los Angeles Clippers, Los Angeles Lakers, Milwaukee Bucks, New Jersey Nets, New York Knicks, Philadelphia 76ers, Phoenix Suns, Portland Trail Blazers, San Antonio Spurs, Seattle Supersonics, Utah Jazz, Washington Bullets, the National Basketball Players Association and the Philadelphia 76ers Basketball Club, Inc., Defendants-Appellees.**

**No. 1454, Docket 86–7173.**

United States Court of Appeals, Second Circuit.

Argued June 10, 1986.

Decided Jan. 21, 1987.

Elliot H. Pollack, New York City (Fred L. Slaughter, of counsel), for plaintiff-appellant.

Jeffrey A. Mishkin, New York City, (Francis D. Landrey, Proskauer Rose Goetz & Mendelsohn, New York City, Gary B. Bettman, General Counsel, National Basketball Ass'n, of counsel), for defendants-appellees National Basketball Ass'n and Philadelphia 76ers Basketball Club, Inc.

James W. Quinn, New York City (Jeffrey S. Klein, Joel C. Schochet, Weil, Gotshal & Manges, New York City, of counsel), for defendant-appellee National Basketball Players Ass'n.

Before WINTER and PRATT, Circuit Judges, and MALETZ, Judge.[*]

WINTER, Circuit Judge:

O. Leon Wood, an accomplished point-guard from California State University at Fullerton and a member of the gold medal-winning 1984 United States Olympic basketball team, appeals from Judge Carter's dismissal of his antitrust action challenging certain provisions of a collective bargaining agreement between the National Basketball Association ("NBA"), its member-teams, and the National Basketball Players Association ("NBPA"). Wood contends that the "salary cap," college draft, and prohibition of player corporations violate Section 1 of the Sherman Act, 15 U.S.C. § 1 (1982), and are not exempt from the Sher-

---

[*] Honorable Herbert N. Maletz, Judge, United States Court of International Trade, sitting by designation.

man Act by reason of the non-statutory "labor exemption." We disagree and affirm.

The challenged provisions are in part the result of the settlement of an earlier antitrust action brought by players against the NBA. *Robertson v. National Basketball Ass'n*, 72 F.R.D. 64 (S.D.N.Y.1976), *aff'd*, 556 F.2d 682 (2d Cir.1977). In that case, a class consisting of all NBA players challenged both the merger of the NBA with the now-defunct American Basketball Association and certain NBA employment practices, including the college draft system by which teams obtain the exclusive right to negotiate with particular college players. Following extensive pre-trial proceedings, *see Robertson v. National Basketball Ass'n*, 413 F.Supp. 88 (S.D.N.Y.1976); 67 F.R.D. 691 (S.D.N.Y.1975); 389 F.Supp. 867 (S.D.N.Y.1975), the parties settled the case on April 29, 1976. The Settlement Agreement provided for the payment of $4.3 million to the class and for substantial modification of the practices attacked by the plaintiffs.

The Settlement Agreement is effective through the 1986–87 season. It modified the college draft system by limiting to one year the period during which a team has exclusive rights to negotiate with and sign its draftees. If a draftee remains unsigned at the time of the next year's draft, he may re-enter the draft. Most important, the Settlement Agreement instituted a system of free agency allowing veteran players to sell their services to the highest bidder subject only to their current team's right of first refusal that allows it to match the best offer.

On October 10, 1980, the NBA and NBPA signed a collective bargaining agreement that incorporated the provisions of the Settlement Agreement pertinent to this action. The 1980 collective agreement expired on June 1, 1982, however, and the 1982–83 season began before a new agreement had been reached. Negotiations between the NBA and the NBPA continued and centered on the league's insistence upon controls on the growth in players' salaries. The NBA claimed that increases in players' salaries resulting from free agency were in part responsible for mounting losses and that a number of its teams might face bankruptcy absent some stabilization of expenses. The NBPA, after reviewing the teams' financial data, reached an agreement in principle with the NBA on March 31, 1983, some 48 hours before a strike deadline set by the players. This agreement was memorialized in writing on April 18, 1983, in a Memorandum of Understanding (the "Memorandum").

The Memorandum continued the college draft and free agency/first refusal provisions of the earlier agreements and, like those agreements, included provisions for fringe benefits such as pensions and medical and life insurance. However, the Memorandum also established a minimum for individual salaries and a minimum and maximum for aggregate team salaries. The latter are styled the salary cap provisions, even though they establish a floor as well as a ceiling. Under the salary cap, a team that has reached its maximum allowable team salary may sign a first-round draft choice like Wood only to a one-year contract for $75,000. An integral part of the method by which the floor and ceiling on aggregate team salaries were to be determined was a guarantee that the players would receive 53 percent of the NBA's gross revenues, including new revenues, in salaries and benefits. This combination of fringe benefits, draft, free agency, a floor and a ceiling on aggregate team salaries, and guaranteed revenue sharing was unique in professional sports negotiations.

The Memorandum also prohibited the use of "player corporations," which had been formed by players to enter into contracts with teams. According to the NBPA's general counsel, the players agreed to this prohibition in light of changes in the tax laws that "virtually eliminated" the tax advantages of incorporation. The teams sought the prohibition to eliminate administrative and accounting difficulties and potential withholding tax liability that arose

from their entering into contracts with player corporations.

Because the Memorandum altered certain terms and conditions of the Settlement Agreement, the NBA and NBPA jointly requested district court approval of a modification of the Settlement Agreement. Fed.R.Civ.P. 23(e). After a hearing at which class members were invited to address the fairness and adequacy of the modification, Judge Carter approved it on June 13, 1983.

Against this background, the Philadelphia 76ers drafted Wood in the first round of the 1984 college draft. At the time of the draft, the 76ers' team payroll exceeded the amount permitted under the salary cap. The 76ers therefore tendered to Wood a one-year $75,000 contract, the amount stipulated under the salary cap. This offer was a formality, however, necessary to preserve its exclusive rights to sign him. In fact, the team informed Wood's agent of its intention to adjust its roster so as to enable it to negotiate a long-term contract with Wood for substantially more money. Wood understandably did not sign the proffered contract.

On September 13, 1984, he turned from the basketball court to the district court and sought a preliminary injunction restraining enforcement of the agreement between the NBA and NBPA and compelling teams other than the 76ers to cease their refusal to deal with him except on the terms set out in the collective bargaining agreement and Memorandum.

Judge Carter denied Wood's motion. *Wood v. National Basketball Ass'n,* 602 F.Supp. 525 (S.D.N.Y.1984). He found that both the salary cap and college draft provisions

> affect only the parties to the collective bargaining agreement—the NBA and the players—involve mandatory subjects of bargaining as defined by federal labor laws, and are the result of bona fide arms-length negotiations. Both are

proper subjects of concern by the Players Association. As such these provisions come under the protective shield of our national labor policy and are exempt from the reach of the Sherman Act. *Id.* at 528.

In addition, he rejected Wood's claim with respect to the prohibition of player corporations, noting that such a provision was probably a mandatory subject of bargaining, and that even if it was not, it raised no antitrust problems. *Id.* at 529. Meanwhile, Wood signed a contract with the 76ers that provided for $1.02 million in total compensation over a four-year period, including a $135,000 signing bonus. Wood has since been traded.

In January 1986, the parties made an evidentiary submission to Judge Carter for a decision on the merits. This consisted of papers submitted with the motion for a preliminary injunction and a stipulation of additional facts. On February 5, 1986, Judge Carter granted judgment to the defendants. This appeal followed.

## DISCUSSION

Plaintiff views the salary cap, college draft and prohibition of player corporations as an agreement among horizontal competitors, the NBA teams, to eliminate competition for the services of college basketball players. As such, he claims, they constitute *per se* violations of Section 1 of the Sherman Act.[1]

Because the college draft and salary cap are the centerpieces of this litigation, we put the player corporation issue momentarily to one side in order to simplify our discussion. We may assume for purposes of this decision that the individual NBA teams and not the league are the relevant employers and that Wood would obtain considerably more favorable employment terms were the draft and salary cap eliminated so as to allow him to offer his services to the highest bidder among NBA

---

1. Full disclosure requires the author of this opinion to note that this is not the first occasion on which he has written on this subject. *See* Jacobs and Winter, *Antitrust Principles and Collective Bargaining by Athletes: Of Superstars in Peonage,* 81 Yale L.J. 1 (1971).

teams. We may further assume that were these arrangements agreed upon by the NBA teams in the absence of a collective bargaining relationship with a union representing the players, they would be illegal and plaintiff would be entitled to relief.

■ The draft and salary cap are not, however, the product solely of an agreement among horizontal competitors but are embodied in a collective agreement between an employer or employers and a labor organization reached through procedures mandated by federal labor legislation. Their legality therefore, cannot be assessed without reference to that legislation. The interaction of the Sherman Act and federal labor legislation is an area of law marked more by controversy than by clarity. *See* R. Gorman, *Labor Law* 631–35 (1976) (*"Gorman"*). We need not enter this debate or probe the exact contours of the so-called statutory or non-statutory "labor exemptions," however, because no one seriously contends that the antitrust laws may be used to subvert fundamental principles of our federal labor policy as set out in the National Labor Relations Act. 29 U.S.C. §§ 151–169 (1982). Wood's claim is just such a wholesale subversion of that policy, and it must be rejected out of hand. As a result, whether the draft and salary cap are *per se* violations of the antitrust laws or subject to rule of reason analysis need not be decided.

Although the combination of the college draft and salary cap may seem unique in collective bargaining (as are the team salary floor and 53 percent revenue sharing agreement), the uniqueness is strictly a matter of appearance. The nature of professional sports as a business and professional sports teams as employers calls for contractual arrangements suited to that unusual commercial context. However, these arrangements result from the same federally mandated processes as do collective agreements in the more familiar industrial context. Moreover, examination of the particular arrangements arrived at by the NBA and NBPA discloses that they have functionally identical, and identically anticompetitive, counterparts that are routinely included in industrial collective agreements.

■ Among the fundamental principles of federal labor policy is the legal rule that employees may eliminate competition among themselves through a governmentally supervised majority vote selecting an exclusive bargaining representative. Section 9(a) of the National Labor Relations Act explicitly provides that "[r]epresentatives ... selected ... by the majority of the employees in a unit ... shall be the exclusive representatives of all the employees in such unit for the purposes of collective bargaining." 29 U.S.C. § 159(a). Federal labor policy thus allows employees to seek the best deal for the greatest number by the exercise of collective rather than individual bargaining power. Once an exclusive representative has been selected, the individual employee is forbidden by federal law from negotiating directly with the employer absent the representative's consent, *NLRB v. Allis-Chalmers Mfg. Co.*, 388 U.S. 175, 180, 87 S.Ct. 2001, 2006, 18 L.Ed.2d 1123 (1967), even though that employee may actually receive less compensation under the collective bargain than he or she would through individual negotiations. *J.I. Case Co. v. NLRB*, 321 U.S. 332, 338–39, 64 S.Ct. 576, 580–81, 88 L.Ed. 762 (1944).

■ The gravamen of Wood's complaint, namely that the NBA–NBPA collective agreement is illegal because it prevents him from achieving his full free market value, is therefore at odds with, and destructive of, federal labor policy.[2] It is true that the diversity of talent and specialization among professional athletes and the widespread exposure and discussions of

**2.** The assumed fact that several competing employers have agreed to the draft and salary cap is of no legal significance because that agreement is embodied in a collective agreement. Multi-employer bargaining is authorized by the National Labor Relations Act and is commonplace. *NLRB v. Truck Drivers Local Union, No. 449, International Brotherhood of Teamsters*, 353 U.S. 87, 94–96, 77 S.Ct. 643, 646–48, 1 L.Ed.2d 676 (1957).

their "work" in the media make the differences in value among them as "workers" more visible than the differences in efficiency and in value among industrial workers. High public visibility, however, is no reason to ignore federal legislation that explicitly prevents employees, whether in or out of a bargaining unit, from seeking a better deal where that deal is inconsistent with the terms of a collective agreement.

Indeed, examination of the criteria that Wood advances as the basis for striking down the draft and salary cap reveals that there is hardly a collective agreement in the nation that would survive his legal theory. For example, Wood emphasizes his superior abilities as a point-guard and his selection in the first round of the college draft as grounds for enabling him to bargain individually for a higher salary. However, collective agreements routinely set standard wages for employees with differing responsibilities, skills, and levels of efficiency. Wood's theory would allow any employee dissatisfied with his salary relative to those of other workers to insist upon individual bargaining, contrary to explicit federal labor policy. As one commentator has noted, "Congress gave to the majority representative the task of harmonizing and adjusting the conflicting interests of employees within the bargaining unit, no matter how diverse their skills, experience, age, race or economic level." *Gorman* at 379. And the Supreme Court has observed, "The complete satisfaction of all who are represented is hardly to be expected." *Ford Motor Co. v. Huffman,* 345 U.S. 330, 338, 73 S.Ct. 681, 686, 97 L.Ed. 1048 (1953).

■ Wood also attacks the draft and salary cap because they assign him to work for a particular employer at a diminished wage. However, collective agreements in a number of industries provide for the exclusive referral of workers by a hiring hall to particular employers at a specified wage.

*See Local 357, International Brotherhood of Teamsters v. NLRB,* 365 U.S. 667, 81 S.Ct. 835, 6 L.Ed.2d 11 (1961); *Associated General Contractors of America, Houston Chapter,* 143 N.L.R.B. 409, *enforced,* 349 F.2d 449 (5th Cir.1965), *cert. denied,* 382 U.S. 1026, 86 S.Ct. 648, 15 L.Ed.2d 540 (1966). The choice of employer is governed by the rules of the hiring hall, not the preference of the individual worker. There is nothing that prevents such agreements from providing that the employee either work for the designated employer at the stipulated wage or not be referred at that time. Otherwise, a union might find it difficult to provide the requisite number of workers to employers. Such an arrangement is functionally indistinguishable from the college draft.

■ Wood further attacks the draft and salary cap as disadvantaging new employees. However, newcomers in the industrial context routinely find themselves disadvantaged vis-a-vis those already hired. A collective agreement may thus provide that salaries, layoffs, and promotions be governed by seniority, *Ford Motor Co. v. Huffman,* 345 U.S. at 337–39, 73 S.Ct. at 685–87, even though some individuals with less seniority would fare better if allowed to negotiate individually.

■ Finally, Wood argues that the draft and salary cap are illegal because they affect employees outside the bargaining unit. However, that is also a commonplace consequence of collective agreements. Seniority clauses may thus prevent outsiders from bidding for particular jobs, and other provisions may regulate the allocation or subcontracting of work to other groups of workers. *See Fibreboard Paper Products Corp. v. NLRB,* 379 U.S. 203, 210–15, 85 S.Ct. 398, 402–05, 13 L.Ed.2d 233 (1964). Indeed, the National Labor Relations Act explicitly defines "employee" in a way that includes workers outside the bargaining unit. 29 U.S.C. § 152(3).[3]

---

**3.** The definition provides, in pertinent part, that "[t]he term 'employee' shall include any employee, *and shall not be limited to the employees of a particular employer,* unless this subchapter ex-plicitly states otherwise." 29 U.S.C. § 152(3) (emphasis added). *See also Reliance Ins. Cos. v. NLRB,* 415 F.2d 1, 6 (8th Cir.1969) (job applicants are "employees" within meaning of 29

If Wood's antitrust claim were to succeed, all of these commonplace arrangements would be subject to similar challenges, and federal labor policy would essentially collapse unless a wholly unprincipled, judge-made exception were created for professional athletes. Employers would have no assurance that they could enter into any collective agreement without exposing themselves to an action for treble damages. Moreover, recognition of a right to individual bargaining without the consent of the exclusive representative would undermine the status and effectiveness of the exclusive representative, and result in individual contracts that reduce the amount of wages or other benefits available for other workers. Wood's assertion that he would be paid more in the absence of the draft and salary cap also implies that others would receive less if he were successful. It can hardly be denied that the NBA teams would be more resistant to benefits guaranteed to all, such as pensions, minimum salaries, and medical and insurance benefits. In fact, the salary cap challenged by Wood is one part of a complex formula including minimum team salaries and guaranteed revenue sharing.

The policy claim that one can do better through individual bargaining is nothing but the flip side of the policy claim that other employees need unions to protect their interests. Congress has accepted the latter position, and we are bound by that legislative choice.

■ The fact that one cannot alter important provisions of a collective agreement without undermining other provisions demonstrates that Wood's antitrust claim fundamentally conflicts in yet another way with national labor policy. That policy attaches prime importance to freedom of contract between the parties to a collective agreement. *See* H. Wellington, *Labor and the Legal Process* 49–90 (1968). Freedom of contract is an important cornerstone of national labor policy for two reasons. First, it allows an employer and a union to

agree upon those arrangements that best suit their particular interests. *Id.* at 28–29. Courts cannot hope to fashion contract terms more efficient than those arrived at by the parties who are to be governed by them. Second, freedom of contract furthers the goal of labor peace. *Id.* at 45. To the extent that courts prohibit particular solutions for particular problems, they reduce the number and quality of compromises available to unions and employers for resolving their differences.

Freedom of contract is particularly important in the context of collective bargaining between professional athletes and their leagues. Such bargaining relationships raise numerous problems with little or no precedent in standard industrial relations. As a result, leagues and player unions may reach seemingly unfamiliar or strange agreements. If courts were to intrude and to outlaw such solutions, leagues and their player unions would have to arrange their affairs in a less efficient way. It would also increase the chances of strikes by reducing the number and quality of possible compromises.

■ The issues of free agency and entry draft are at the center of collective bargaining in much of the professional sports industry. It is to be expected that the parties will arrive at unique solutions to these problems in the different sports both because sports generally differ from the industrial model and because each sport has its own peculiar economic imperatives. The NBA/NBPA agreement is just such a unique bundle of compromises. The draft and the salary cap reflect the interests of the employers in stabilizing salary costs and spreading talent among the various teams. Minimum individual salaries, fringe benefits, minimum aggregate team salaries, and guaranteed revenue sharing reflect the interests of the union in enhancing standard benefits applicable to all players. The free agency/first refusal provisions in turn allow individual players to exercise a degree of individual bargaining

U.S.C. § 152(3)); *Time-O-Matic, Inc. v. NLRB,* 264 F.2d 96, 99 (7th Cir.1959) (same); *John*

*Hancock Mut. Life Ins. Co. v. NLRB,* 191 F.2d 483, 485 (D.C.Cir.1951).

power.[4] Were a court to intervene and strike down the draft and salary cap, the entire agreement would unravel.[5] This would force the NBA and NBPA to search for other avenues of compromise that would be less satisfactory to them than the agreement struck down. It would also measurably increase the chances of a strike. We decline to take that step.[6]

We also agree with the district court that all of the above matters are mandatory subjects of bargaining under 29 U.S.C. § 158(d). Each of them clearly is intimately related to "wages, hours, and other terms and conditions of employment." Indeed, it is precisely because of their direct relationship to wages and conditions of employment that such matters are so controversial and so much the focus of bargaining in professional sports. Wood's claim for damages, for example, is based on an allegation of lost wages. For similar reasons, the prohibition on player corporations cannot be challenged on antitrust grounds. Use of player corporations may (or currently may not) increase the true salary received by players because of tax advantages, but also may increase the true wages paid by the NBA and its teams because of enhanced administrative costs. As such, it is a paradigmatic subject for bargaining.

It is true that the combination of the draft and salary cap places new players coming out of college ranks at a disadvantage. However, as noted earlier, that is hardly an unusual feature of collective agreements. In the industrial context salaries, promotions, and layoffs are routinely governed by seniority, with the benefits going to the older employees, the burdens to the newer. Wood has offered us no reason whatsoever to fashion a rule based on antitrust grounds prohibiting agreements between employers and players that use seniority as a criterion for certain employment decisions. Even if some such arrangements might be illegal because of discrimination against new employees (players), the proper action would be one for breach of the duty of fair representation. See Ford Motor Co. v. Huffman, supra; Ferro v. Railway Express Agency, Inc., 296 F.2d 847 (2d Cir.1961); cf. Britt v. Trailmobile Co., 179 F.2d 569 (6th Cir.), cert. denied, 340 U.S. 820, 71 S.Ct. 52, 95 L.Ed. 603 (1950).

Wood relies for legal support primarily upon the Supreme Court's decisions in Connell Construction Co. v. Plumbers and Steamfitters Local Union No. 100, 421 U.S. 616, 95 S.Ct. 1830, 44 L.Ed.2d 418 (1975); Local Union 189, Amalgamated Meat Cutters v. Jewel Tea Co., 381 U.S. 676, 85 S.Ct. 1596, 14 L.Ed.2d 640 (1965);

**4.** At oral argument, counsel for Wood argued that because players are allowed a limited right by the collective agreement to bargain individually, the antitrust laws somehow compel that the right be unqualified. We perceive neither logic, policy, nor legal authority supporting this claim. No one denies that a union and employer, including the NBPA and NBA, may set a fixed salary for an employee, an agreement that might well be far worse for Wood than the provisions he now challenges. To hold that the NBPA and NBA must as a matter of law opt either for fixed salaries or unlimited individual bargaining would further no legitimate goal. One might well speculate that only a destructive impasse would result.

**5.** This discussion is for illustrative purposes only and does not imply that a particular *quid pro quo* must be proven to avoid antitrust liability. Invalidation of any provision that goes to the bottom line may affect seemingly unrelated provisions. Nor does it imply that a party may not insist upon a deal that is more one-sided

than the NBA–NBPA arrangement. See NLRB v. American National Ins. Co., 343 U.S. 395, 402, 72 S.Ct. 824, 828, 96 L.Ed. 1027 (1952) (noting that National Labor Relations Act does not "regulate the substantive terms governing wages, hours and working conditions which are incorporated in an agreement"). Any claim of unreasonable bargaining behavior must be pursued in an unfair labor practice proceeding charging a refusal to bargain in good faith, 29 U.S.C. § 158(a)(5), not in an action under the Sherman Act.

**6.** Virtually all of the courts that have addressed the present issues have reached a conclusion similar to ours, although on somewhat different grounds. See McCourt v. California Sports, Inc., 600 F.2d 1193, 1197–98 (6th Cir.1979); Mackey v. National Football League, 543 F.2d 606, 614 (8th Cir.1976), cert. dismissed, 434 U.S. 801, 98 S.Ct. 28, 54 L.Ed.2d 59 (1977); Zimmerman v. National Football League, 632 F.Supp. 398, 403–04 (D.D.C.1986).

and *United Mine Workers v. Pennington*, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965). He reads those decisions as holding generally that a person outside the bargaining unit, in his case an unsigned first-round draft choice, who is injured in an anticompetitive fashion by a collective agreement may challenge that agreement on antitrust grounds. However, these cases are so clearly distinguishable that they need not detain us. Each of the decisions involved injuries to *employers* who asserted that they were being excluded from competition in the product market. Wood cites no case in which an employee or potential employee was able to invalidate a collective agreement on antitrust grounds because he or she might have been able to extract more favorable terms through individual bargaining. We need not determine the precise limits of the rules laid down by the cases cited or consider fine distinctions going to whether product- or labor-market activities are in issue. Wood's claim is beyond peradventure one that implicates the labor market and subverts federal labor policy. It must, therefore, be rejected.

Affirmed.