67 F.3d 1054
 150 L.R.R.M. (BNA) 2390, 64 USLW 2239,
131 Lab.Cas. P 11,433
 Daniel SILVERMAN, Regional Director for Region 2 of the
National Labor Relations Board, for and on behalf
of the National Labor Relations Board,
Petitioner-Appellee,
v.
MAJOR LEAGUE BASEBALL PLAYER RELATIONS COMMITTEE, INC. and
the Constituent Member Clubs of Major League
Baseball, Respondents-Appellants.
 No. 1999, Docket 95-6048.
 United States Court of Appeals,
Second Circuit.
 Argued May 11, 1995.
Decided Sept. 29, 1995.
 
 Douglas L. Leslie, Charlottesville, Virginia (Lisa Klein Wager, Francis L. Casey, III, Morgan, Lewis & Bockius, New York, New York, of counsel), for Respondents-Appellants.
 Ellen A. Farrell, Assistant General Counsel (Frederick L. Feinstein, General Counsel, Mary Joyce Carlson, Assistant General Counsel, Robert E. Allen, Associate General Counsel, Donald B. Zavelo, Ian M. Penny, of counsel, National Labor Relations Board, Washington, D.C.), for Petitioner-Appellee.
 George M. Cohen (Virginia A. Seitz, Bredhoff & Kaiser, Washington, D.C., of counsel), for Amicus Curiae Major League Baseball Players Association.
 Before: NEWMAN, Chief Judge, WINTER, and MAHONEY, Circuit Judges.
 WINTER, Circuit Judge:
 
 
 1
 This is an appeal by the Major League Baseball Player Relations Committee, Inc. ("PRC") and the constituent member clubs of Major League Baseball ("Clubs") from a temporary injunction issued by Judge Sotomayor pursuant to section 10(j) of the National Labor Relations Act ("NLRA"), 29 U.S.C. Sec. 160(j). The PRC is the collective bargaining representative for the twenty-eight Clubs. The Major League Baseball Players Association is a union that is the exclusive bargaining representative for the forty-man rosters of each major league club. The injunction is based on the district court's conclusion that appellants violated NLRA Secs. 8(a)(1) and (5), 29 U.S.C. Secs. 158(a)(1) and (5), by unilaterally implementing terms and conditions of employment that differed from those in the last collective agreement. It orders the PRC and the Clubs to: (i) abide by the terms of an expired collective agreement, (ii) rescind any actions taken that are inconsistent with that agreement and (iii) bargain in good faith with the Players Association. See Silverman v. Major League Baseball Player Relations Comm., Inc., 880 F.Supp. 246, 261 (S.D.N.Y.1995). The injunction is to remain in effect until either (i) the expired agreement is replaced by a new collective bargaining agreement, (ii) the National Labor Relations Board ("NLRB") renders a final disposition of the matters pending before it in the related administrative case, or (iii) the district court finds, upon petition of either of the parties, that an impasse has occurred. See id. We affirm.
 
 BACKGROUND
 
 2
 On January 1, 1990, the most recent collective agreement ("Basic Agreement") between appellants and the Players Association became effective. It contained provisions implementing a combination of free agency and a reserve system--that is, a compromise between free competitive bidding for a player's services and an individual club's exclusive rights to those services.
 
 
 3
 Free agency, in its purest form, is a status in which the rights to a player's athletic services are not owned by a club and may be shopped around by the player in a quest for the most attractive bid. However, for more than a century, Major League Baseball has had a reserve system that to one degree or another affords individual clubs exclusive property rights to the athletic services of certain players. Before the players were organized and a collective bargaining relationship was established, the standard players contract with a club reserved to the club exclusive rights to a player's services and provided for an annual right of renewal of the contract by the club in question. The Clubs interpreted the contract as allowing the club in question to renew all of an individual player's contract, including the right of renewal provision. So interpreted, this provision--known generally as the "reserve clause"--bound a player to one club in perpetuity until traded or released. After the Clubs recognized the Players Association and entered into a collective agreement with it, an arbitrator held in a grievance proceeding that the reserve clause allowed a renewal for only one year rather than a succession of years. See National & American League Professional Baseball Clubs v. Major League Baseball Players Ass'n, 66 Lab.Arb. (BNA) 101 (1976) (Seitz, Arb.). Since then, appellants and the Players Association have struggled to accommodate their conflicting interests in the free agency and reserve issues, and a variety of compromises have from time to time been reached. However, relations have been acrimonious, and several strikes and lockouts have occurred. This appeal itself arises out of a strike that terminated the 1994 season before the playoffs and World Series.
 
 
 4
 Article XX of the Basic Agreement that became effective in 1990 contains a series of provisions that govern free agency and reserve rights. Players with six or more years of major league service are free agents and may seek competing bids in an effort to obtain the best contract, which may of course give exclusive rights to the club for a stipulated number of years. See Silverman, 880 F.Supp. at 250. Free agency is guaranteed by an anti-collusion provision, Article XX(F), which prohibits the Clubs from acting in concert with each other with respect to the exercise of rights under Article XX. See id. Article XX(F) thus prevents the Clubs from agreeing either to refuse to bid for the services of free agents or to offer only low bids to them. Article XX(F) also prohibits players from acting in concert with regard to Article XX rights. See id.
 
 
 5
 Players with less than six years of service remain under reserve to their individual clubs, although a club may reserve a player only once. Although a minimum annual salary is provided, players with less than three years of major league service must negotiate with their clubs to determine their salary for the coming season. Article XX allows certain reserved players--generally those with more than three but less than six years of service--to demand salary arbitration. See id. at 251. Salary arbitration is a mechanism for determining the individual salaries for that group of reserved players if they cannot arrive at an agreement with their clubs. The player and the club each present the arbitrator with a suggested salary figure for a new one-year contract. The arbitrator then inserts either the player's or the club's figure into a blank uniform contract that the parties have already signed. See id. Article VI(F)(12) provides the following with regard to the criteria to be used, and the evidence to be heard, by the arbitrator:
 
 
 6
 (12) Criteria. (a) The Criteria will be the quality of the Player's contribution to his Club during the past season (including but not limited to his overall performance, special qualities of leadership and public appeal), the length and consistency of his career contribution, the record of the Player's past compensation, comparative baseball salaries ..., the existence of any physical or mental defects on the part of the Player, and the recent performance record of the Club including but not limited to its League standing and attendance as an indication of public acceptance (subject to the exclusion stated in subparagraph (b)(i) below). Any evidence may be submitted which is relevant to the above criteria, and the arbitrator shall assign such weight to the evidence as shall to him appear appropriate under the circumstances. The arbitrator shall, except for a Player with five or more years of Major League service, give particular attention, for comparative salary purposes, to the contracts of Players with Major League service not exceeding one annual service group above the Player's annual service group. This shall not limit the ability of a Player or his representative, because of special accomplishment, to argue the equal relevance of salaries of Players without regard to service, and the arbitrator shall give whatever weight to such argument as he deems appropriate.
 
 
 7
 (b) Evidence of the following shall not be admissible:
 
 
 8
 (i) The financial position of the Player and the Club;
 
 
 9
 (ii) Press comments, testimonials or similar material bearing on the performance of either the Player or the Club, except that recognized annual Player awards for playing excellence shall not be excluded;
 
 
 10
 (iii) Offers made by either Player or Club prior to arbitration;
 
 
 11
 (iv) The cost to the parties of their representatives, attorneys, etc.;
 
 
 12
 (v) Salaries in other sports or occupations.
 
 
 13
 The Basic Agreement expired on December 31, 1993, pursuant to the PRC's notice of termination. Although negotiations for a successor agreement did not get underway until March 1994, the PRC and the Players Association continued to observe the terms of the expired Basic Agreement. Prior to the commencement of negotiations, the Clubs and the Players Association had completed individual salary arbitration hearings and had entered into individual player contracts for the 1994 baseball season, which began in April 1994. See Silverman, 880 F.Supp. at 251.
 
 
 14
 Negotiations for a new collective bargaining agreement continued unsuccessfully. The PRC offered its first formal economic proposal to the Players Association at a meeting on June 14, 1994. It included a "salary cap," a mechanism that establishes a ceiling on the total player salaries paid by each club. The ceiling may allow some flexibility, depending on the details. Generally, the aggregate salaries of each team are determined by an agreed upon formula and must remain above a minimum percentage of industry revenues, also determined by an agreed upon formula, but below a maximum percentage of those revenues. See Wood v. National Basketball Ass'n, 809 F.2d 954, 957 (2d Cir.1987). The PRC proposal also eliminated the salary arbitration system and substituted restricted free agency rights for those reserved players previously eligible for salary arbitration. As an alternative to the PRC's proposed salary cap, the Players Association suggested a revenue sharing and luxury "tax" plan that would impose a tax on high-paying clubs. Subsequent proposals reflected disagreement over appropriate tax rates and payroll thresholds above which clubs would be subject to the tax. See Silverman, 880 F.2d at 251-52.
 
 
 15
 The players struck on August 12, and the 1994 baseball season never resumed. On December 22, 1994, the PRC declared an impasse in negotiations and stated that it intended unilaterally to impose a salary cap and to implement other changes in the terms and conditions of employment, including the elimination of salary arbitration. See Silverman, 880 F.2d at 252. The Players Association responded with a unilateral ban on players signing individual contracts with the Clubs.
 
 
 16
 Thereafter, cross-charges of unfair labor practices were filed with the National Labor Relations Board ("NLRB") by the Players Association and the Clubs. The Players Association alleged that the Clubs had engaged in unfair labor practices by unilaterally implementing the salary cap and other terms because the parties were not at an impasse.
 
 
 17
 On February 3, 1995, counsel for the PRC notified the NLRB General Counsel that the PRC would revoke the implementation of unilateral changes and restore the status quo ante. The General Counsel indicated that the Players Association charges would be dismissed as a result. Counsel for the PRC informed the General Counsel, however, that the PRC did not believe itself obligated to maintain provisions of the Basic Agreement that involved non-mandatory subjects of bargaining. He mentioned salary arbitration in that regard and also suggested that the Clubs might decide to bargain exclusively through the PRC. The NLRB General Counsel declined to offer an advisory opinion on these matters.
 
 
 18
 Three days later, by memorandum dated February 6, counsel for the PRC notified the Clubs that, until a new collective bargaining agreement was ratified or until further notice, individual clubs had no authority to negotiate contracts with individual players because the PRC was now the Clubs' exclusive bargaining representative. This amounted to an agreement among the Clubs not to hire free agents and thus was a departure from the anti-collusion provision, Article XX(F) of the Basic Agreement. It also amounted to an elimination of salary arbitration, because salary arbitration is a method of arriving at a wage for an individual player contract with a club.
 
 
 19
 The Players Association thereupon filed a new unfair labor practice charge, and the General Counsel issued a complaint alleging, inter alia, that the Clubs and the PRC had violated Sections 8(a)(1) and (5) of the NLRA by unilaterally eliminating, before an impasse had been reached, competitive bidding for the services of free agents, the anti-collusion provision, and salary arbitration for certain reserved players. The NLRB found that these matters were related to wages, hours, and other terms and conditions of employment and were therefore mandatory subjects for collective bargaining. It then authorized its General Counsel to seek an injunction under NLRA Sec. 10(j). On March 27, the NLRB Regional Director filed a petition seeking a temporary injunction restraining the alleged unfair labor practices.
 
 
 20
 The district court agreed that the NLRB had reasonable cause to conclude that free agency and salary arbitration were mandatory subjects of bargaining and that the Clubs' unilateral actions constituted an unfair labor practice. The district court also concluded that injunctive relief was warranted. This appeal followed. We denied a stay on April 4.
 
 DISCUSSION
 
 21
 The NLRB is authorized under Section 10(j) of the NLRA to petition for temporary injunctive relief from a district court to enjoin ongoing unfair labor practices. 29 U.S.C. Sec. 160(j). If the court has reasonable cause to believe that an unfair labor practice has occurred and that injunctive relief would be just and proper, it should grant appropriate relief. Kaynard v. MMIC, Inc., 734 F.2d 950, 953 (2d Cir.1984). The court need not make a final determination that the conduct in question is an unfair labor practice. Kaynard v. Mego Corp., 633 F.2d 1026, 1033 (2d Cir.1980). It need find only reasonable cause to support such a conclusion. See id.; MMIC, 734 F.2d at 953. Appropriate deference must be shown to the judgment of the NLRB, and a district court should decline to grant relief only if convinced that the NLRB's legal or factual theories are fatally flawed. See Mego, 633 F.2d at 1031, 1033; Kaynard v. Palby Lingerie, Inc., 625 F.2d 1047, 1051 (2d Cir.1980). In reviewing a district court's grant of injunctive relief pursuant to Section 10(j), a court of appeals must also accord deference to the district court's decision, at least with regard to those aspects that are traditionally left to the district court's discretion. Mego, 633 F.2d at 1030.
 
 
 22
 We turn now to the merits of the regional director's petition. The petition invokes basic principles of labor law. Section 8(d) of the NLRA mandates that employers and unions bargain in good faith over "wages, hours, and other terms and conditions of employment." 29 U.S.C. Sec. 158(d). These are so-called mandatory subjects of bargaining. Under caselaw, the parties may propose and bargain over, but may not insist upon, permissive subjects of bargaining. NLRB v. Wooster Div. of Borg-Warner Corp., 356 U.S. 342, 349, 78 S.Ct. 718, 723, 2 L.Ed.2d 823 (1958). When a collective agreement expires, an employer may not alter terms and conditions of employment involving mandatory subjects until it has bargained to an impasse over new terms. NLRB v. Katz, 369 U.S. 736, 741-43, 82 S.Ct. 1107, 1110-11, 8 L.Ed.2d 230 (1962). Thereafter, it may implement the new terms. Generally, when an agreement expires, an employer need not bargain to an impasse over terms and conditions involving permissive subjects but may alter them upon expiration. Allied Chem. & Alkali Workers v. Pittsburgh Plate Glass Co., 404 U.S. 157, 187-88, 92 S.Ct. 383, 402, 30 L.Ed.2d 341 (1971).
 
 
 23
 Many of the usual issues that arise in impasse cases are not disputed in the instant matter. The parties agree that the PRC, in directing the Clubs to decline to bargain individually with free agents, unilaterally departed from much of Article XX, which provides for a limited form of free agency and forbids collusive behavior by the Clubs in negotiating with free agents. It is also undisputed that the PRC unilaterally departed from the Basic Agreement's provisions with regard to salary arbitration. The PRC does not claim that it had bargained to an impasse over the free agency, the anti-collusion, or the salary arbitration provisions. Finally, it is also agreed that, if those provisions involved mandatory subjects of bargaining, their unilateral abrogation before impasse was a refusal to bargain in good faith.
 
 
 24
 The PRC and the Clubs argue that the anti-collusion and free agency provisions of the Basic Agreement do not involve mandatory subjects of bargaining and are therefore not subject to the Katz rule that unilateral implementation of new terms is an unfair labor practice unless the employer has bargained to an impasse over these new terms. See Silverman, 880 F.Supp. at 254. The PRC and the Clubs contend that an injunction compelling them to maintain the free agency and anti-collusion provisions undermines their right as a multi-employer group to bargain collectively through an exclusive representative. If so, they would be permissive subjects of bargaining. See Borg Warner, 356 U.S. at 349, 78 S.Ct. at 722-23. With regard to salary arbitration, the PRC and the Clubs argue that it is the equivalent of interest arbitration--arbitration of the terms of a new collective agreement--and thus not a mandatory subject of bargaining. See International Bhd. of Elec. Workers (Collier Elec. Co.), 296 N.L.R.B. 1095, 1098, 1989 WL 224423 (1989).
 
 
 25
 We are unpersuaded that an injunction compelling the PRC and the Clubs to observe the anti-collusion and free agency provisions of the Basic Agreement infringes on their right as a multiemployer group to bargain through an exclusive representative. Free agency and the ban on collusion are one part of a complex method--agreed upon in collective bargaining--by which each major league player's salary is determined under the Basic Agreement. They are analogous to the use of seniority, hours of work, merit increases, or piece work to determine salaries in an industrial context. The PRC and the Clubs describe free agency and the ban on collusion as provisions undermining their right to select a joint bargaining representative because those provisions entail individual contracts with clubs. However, the argument ignores the fact that free agency is simply a collectively bargained method of determining individual salaries for one group of players. The anti-collusion provision is not designed to prevent the PRC from representing the Clubs. Rather, that provision guarantees that free agency will be a reality when permitted by the Basic Agreement. The injunction thus does not in any way prevent the PRC from bargaining as the Clubs' exclusive representative with the Players Association over the elimination of free agency in its entirety or for a modified version of the same, and thereafter from implementing any proposals incorporated into a collective bargaining agreement.
 
 
 26
 The question, therefore, is whether the free agency, anti-collusion, and reserve issues are--or there is reasonable cause to believe they are--otherwise mandatory subjects of bargaining. Section 8(d) of the NLRA defines the duty to bargain as "the obligation ... to meet ... and confer in good faith with respect to wages, hours, and other terms and conditions of employment...." In Wood v. Nat'l Basketball Ass'n, 809 F.2d 954 (2d Cir.1987), we noted that free agency and reserve issues are "at the center of collective bargaining in much of the professional sports industry," id. at 961, and that "it is precisely because of [free agency's] direct relationship to wages and conditions of employment that [it is] so controversial and so much the focus of bargaining in professional sports." Id. at 962.
 
 
 27
 Wood noted that collective bargaining between professional athletes and leagues raises "numerous problems with little or no precedent in standard industrial relations." Id. at 961. Such is the case with a free agency and reserve system. For the most part, unionized employees in the industrial sector may leave one employer for another without restriction. The employee may have no bargaining rights with regard to the terms of hire by the new employer, which may be set by a collective agreement, but is nevertheless generally free to go from one unionized job to another.[1]
 
 
 28
 The professional sports industry has a very different history and very different economic imperatives. Most professional sports leagues have always had some form of what has become known as the reserve system. See Flood v. Kuhn, 407 U.S. 258, 259 n. 1, 92 S.Ct. 2099, 2100 n. 1, 32 L.Ed.2d 728 (1972) (baseball); Robertson v. National Basketball Ass'n, 556 F.2d 682, 686 n. 6 (2d Cir.1977) (basketball); Mackey v. National Football League, 543 F.2d 606, 610 (8th Cir.1976) (football), cert. dismissed, 434 U.S. 801, 98 S.Ct. 28, 54 L.Ed.2d 59 (1977); McCourt v. California Sports, Inc., 600 F.2d 1193, 1194 (6th Cir.1979) (hockey). As noted, this is a system by which the right to a player's services becomes the property of a particular club with limited freedom for the player to seek employment with another club. The reserve system in one form or another has been used in major league baseball for over a century. Until the arbitration decision in 1976, the reserve system prevented players from offering their athletic services to competing teams. A player's services were thus the property of a single team until he was traded or released. In enforcing a complete reserve system, Major League Baseball was exercising monopsony power--a buyer's monopoly.
 
 
 29
 However, there are many reasons, apart from maximizing the transfer of revenues from players to clubs, why reserve systems exist within professional sports. Fans might not be interested in games between teams that had entirely new lineups for every contest. Moreover, high quality play may require that individuals practice and play with the same teammates for at least some period of time. Teams may also want to recoup what they regard as training costs invested in players while they gained experience. In antitrust litigation, the leagues perennially argue that some form of reserve system is necessary for competitive balance. See Mackey, 543 F.2d at 611. Indeed, even in a system of complete free agency, one would expect to see many long-term agreements binding individual players to particular clubs.
 
 
 30
 There are also reasons, apart from maximizing the transfer of revenues to players, why a union of professional athletes would seek free agency. It is very difficult to set individual salaries in professional sports through collective bargaining. Although unions of professional athletes may bargain for uniform benefits and minimum salaries, they do not usually follow their industrial counterparts and seek relatively fixed salaries by job description, seniority, or other formulae. Players often play positions requiring very different skills. Moreover, the level of performance and value to a team in attracting fans differs radically among players, with star athletes or popular players being far more valuable than sub-par or nondescript players. Usually, therefore, players unions seek some form of free agency as a relatively simple method of setting individual salaries.
 
 
 31
 Most importantly, however, both the leagues and the players unions view free agency and reserve issues as questions of what share of revenues go to the clubs or to the players. The more restrictive the reserve system is, the greater the clubs' share. The greater the role of free agency, the greater the players' share.
 
 
 32
 To hold that there is no reasonable cause for the NLRB to conclude that free agency and reserve issues are mandatory subjects of bargaining would be virtually to ignore the history and economic imperatives of collective bargaining in professional sports. A mix of free agency and reserve clauses combined with other provisions is the universal method by which leagues and players unions set individual salaries in professional sports. Free agency for veteran players may thus be combined with a reserve system, as in baseball, or a rookie draft, as in basketball, see Wood, 809 F.2d at 957, for newer players. A salary cap may or may not be included. See id. To hold that any of these items, or others that make up the mix in a particular sport, is merely a permissive subject of bargaining would ignore the reality of collective bargaining in sports.
 
 
 33
 Indeed, free agency is in many ways nothing but the flip side of the reserve system. A full reserve system does not eliminate individual bargaining between teams and players. It simply limits that bargaining to one team. If free agency were a permissive subject of collective bargaining, then so would be the reserve system.
 
 
 34
 With regard to salary arbitration, we will assume, but not decide, that if it is a form of interest arbitration, it may be unilaterally eliminated. See George Koch & Sons, Inc., 306 N.L.R.B. 834, 839, 1992 WL 64220 (1992) (interest arbitration permissive subject of bargaining). Interest arbitration is a method by which an employer and union reach new agreements by sending disputed issues to an arbitrator rather than settling them through collective bargaining and economic force. See New York Typographical Union No. 6 v. Printers League, 919 F.2d 3, 3 n. 2 (2d Cir.1990). The salary arbitration provisions of the Basic Agreement are a method by which salaries for some players who are not eligible for free agency--those with three to six years of major league service--are set. The Basic Agreement sets forth criteria by which the arbitrator is to reach a decision. These criteria include the player's performance in the prior year, the length and consistency of career contribution, physical or mental defects, recent performance of the team on the field and at the gate, and salaries of certain comparable players. The Basic Agreement also forbids the arbitrator from considering certain facts that might otherwise be relevant. Finally, the Basic Agreement requires that the arbitrator pick either the club's suggested salary or the player's.
 
 
 35
 We decline to analogize Article VI(F) of the Basic Agreement to interest arbitration. Salary arbitration provides limited discretion to the arbitrator to set salaries for designated players who are not eligible for free agency. The discretion afforded the arbitrator is arguably less than the discretion afforded arbitrators in grievance arbitration involving disputes arising under an existing collective agreement, which is beyond question a mandatory subject of bargaining. In grievance arbitration, an arbitrator may permissibly imply a term even though the term has no explicit support in the text of the collective agreement. See United Steelworkers of America v. Warrior & Gulf Navigation Co., 363 U.S. 574, 581-82, 80 S.Ct. 1347, 1352-53, 4 L.Ed.2d 1409 (1960) ("The labor arbitrator's source of law is not confined to the express provisions of the contract, as the industrial common law--the practices of the industry and the shop--is equally a part of the collective bargaining agreement although not expressed in it."); see also Holly Sugar Corp. v. Distillery, Rectifying, Wine & Allied Workers Int'l Union, 412 F.2d 899, 903 (9th Cir.1969). Similarly, a term may be implied from past practices even though somewhat inconsistent with the agreement. See International Chem. Workers Union, Local No. 278 v. Imco Container Co., 78 L.R.R.M. (BNA) 2014, 1971 WL 800 (S.D.Ind.1971). We thus decline to analogize salary arbitration to interest arbitration, and, therefore, we hold that there is reasonable cause to believe that it is a mandatory subject of bargaining.
 
 
 36
 With regard to whether the granting of relief was "just and proper," 29 U.S.C. Sec. 160(j), we review the district court's determination only for abuse of discretion. Mego, 633 F.2d at 1030; Palby Lingerie, 625 F.2d at 1051. We see no such abuse in the present matter. Given the short careers of professional athletes and the deterioration of physical abilities through aging, the irreparable harm requirement has been met. The unilateral elimination of free agency and salary arbitration followed by just three days a promise to restore the status quo. The PRC decided to settle the original unfair labor practice charges while embarking on a course of action based on a fallacious view of the duty to bargain. We see no reason to relieve it of the consequences of that course.
 
 
 37
 We therefore affirm.
 
 
 
 [1]
 Where employment is sought through a union hiring hall, employees may not have a choice among employers. See Wood, 809 F.2d at 960. Moreover, local unions, as in the construction industry, commonly do not admit to their hiring halls out-of-town members of the same international