Oscar ROBERTSON et al., Plaintiffs,

v.

NATIONAL BASKETBALL ASSOCIATION, a joint venture, et al., Defendants.

No. 70 Civ. 1526.

United States District Court, S. D. New York.

July 30, 1976.

Proskauer, Rose, Goetz & Mendelsohn by George Gallantz, David J. Stern, Michael A. Cardozo, Jeffrey A. Mishkin, Richard L. Wasserman, New York City, for the NBA defendants other than Madison Square Garden Corp. and Madison Square Garden Center, Inc.

Paul, Weiss, Rifkind, Wharton & Garrison by George P. Felleman, New York City, for defendants Madison Square Garden Corp. and Madison Square Garden Center, Inc.

Berger, Phillips, Sprague & Cohen by David Berger, Richard G. Phillips, Paul McMahon, Philadelphia, Pa., and Rembar, Wolf & Curtis by Mortimer Wolf, New York City, for Chester Walker and Clifford Ray.

Boone, Schatzel & Hamrick by John H. Boone, San Francisco, Cal., John Cleveland, New York City, and Seymour S. Goldberg Law Corp. by Seymour S. Goldberg, Encino, Cal., for Wilton N. Chamberlain.

## OPINION

ROBERT L. CARTER, District Judge.

*The Relevant Facts*

This Rule 23(b)(1) class litigation was instituted in April, 1970, on behalf of all present players in the National Basketball Association ("NBA") and all those who would become NBA players prior to final judgment. The complaint seeks the elimination of practices and procedures of the defendant NBA and its member clubs allegedly designed to prevent competition for players' services through the college draft, player allocation, reserve clause, and other such devises. An injunction against a merger of the NBA and the American Basketball Association ("ABA") is also sought.

Early in the history of the litigation, this court (Tenney, J.) issued a preliminary injunction barring any merger or non-competitive agreements between the two leagues for players' services. *See* order of May 4, 1970. The defendants unsuccessfully sought Congressional legislation to exempt the inter-league merger from the pinch of the federal antitrust laws. In August, 1973, Judge Tenney's broad proscrip-

Weil, Gotshal & Manges by Ira M. Millstein, Peter Gruenberger, James W. Quinn, Irwin H. Warren, New York City, for plaintiffs.

tion against merger negotiations between the NBA and ABA was amended to allow such discussions to go forward with the proviso, however, that representatives of the plaintiffs had to be present at any such discussions involving the players' rights and any merger agreement reached could become operative only with court approval. *See* order of August 3, 1973.

Since that modified order was issued, the court has been involved in hearings, arguments, conferences, and in analysis of a massive amount of material submitted by the parties which have served to enlighten and familiarize the court with all facets of the complex issues involved in this litigation. Prosecution of a separate action by ABA against NBA in a district court in California was enjoined, and the action ordered consolidated with the instant action before the court. *See* order of March 22, 1974. The ABA Players Association, after their motion to intervene was denied (*see* endorsement of December 5, 1975), filed a separate lawsuit which is presently pending before the court. *American Basketball Ass'n Players Ass'n v. National Basketball Ass'n,* 75 Civ. 6184. Thus, during the pendency of this action, the court has gained some understanding of player-owner disputes in respect of the players' claims of antitrust violations in what is at present the entire professional basketball entity. The court has surveyed the claims of the parties in this case in several comprehensive opinions, *Robertson v. National Basketball Ass'n,* 389 F.Supp. 867 (S.D.N.Y.1975); *Robertson v. National Basketball Ass'n,* 67 F.R.D. 691 (S.D.N.Y.1975); *see American Basketball Ass'n Players Ass'n v. National Basketball Ass'n,* 404 F.Supp. 832 (S.D.N.Y. 1975); *Robertson v. National Basketball Ass'n,* 413 F.Supp. 88 (S.D.N.Y.1976), and in February, 1975, certified the action as a class action under Rule 23(b)(1), F.R.Civ.P. *Robertson,* 389 F.Supp. at 896, *et seq.*

The February, 1975, determination just referred to was followed by extensive court-ordered activity in preparation for trial, first scheduled for May, 1976, and subsequently advanced to June, 1976. A burden-

some discovery schedule was agreed upon by the parties in the effort to complete all discovery by the court-imposed cut-off date at the end of February, 1976. Between March, 1975, and January, 1976, the parties engaged in massive, far-reaching discovery. Approximately 200,000 documents were produced; some 143 persons were deposed; and 45,000 pages of testimony were transcribed. Counsel for the parties worked diligently and tirelessly in their effort to complete all discovery by the target date imposed by the court. The court was kept advised of the progress of discovery and was required to settle some disputes about the scope, course and nature of the pretrial discovery. *See, e. g.,* order of Sept. 18, 1975; endorsements of October 31, 1975 and November 12, 1975.

By January, all pretrial discovery was virtually completed. The basic supportive facts for each side's contentions had been fully disclosed, and the court's rulings on various pretrial motions had made clear to the parties that although the court had reached tentative legal conclusions based upon incomplete facts, a final determination could not be made until all the proof had been presented. *See, e. g., Robertson,* 389 F.Supp. 867; *American Basketball Ass'n Players Ass'n,* 404 F.Supp. 832.

The plaintiffs and NBA defendants began serious settlement negotiations in January, 1976, in Philadelphia and New York. These discussions involved not only class counsel and counsel for NBA defendants, but members of an NBA negotiating committee, Lawrence Fleisher, general counsel for the NBA Players Association, a group representing named plaintiffs (Oscar Robertson, John Havlicek, and Jeffrey Mullins), and other members of the class (Paul Silas and James McMillian), all of whom participated in negotiating the terms that were finally agreed upon. On February 2, 1976, the settlement was unanimously approved in principle by the player representatives. On March 2, 1976, a letter was mailed to all members of the class outlining the terms of the settlement. On May 5, 1976, a detailed notice of settlement was mailed to all mem-

bers of the class informing them of how to obtain copies of the full agreement, and of how they could contest the settlement.

The settlement provides for the elimination of the reserve clause, a phaseout of reserve compensation, a settlement fund for the class of $4.3 million which provides for a weighted formula of distribution, decided upon by the Players Association based on the years a class member played in the NBA. In this formulation, the earlier years, 1966–70, are weighted more heavily than later years on the theory that after 1970, with the institution of this lawsuit, some of the challenged practices were modified and players' salaries generally rose. Moreover, the settlement provides for the payment by defendant NBA of the fees and disbursements of class counsel. Thus, the class will be able to share in the entire $4.3 million settlement fund provided for players without diminution in the payment of fees and expenditures disbursed by their counsel.

Of the 479 active and retired players in the class only three voiced any objection to the settlement. Two of them, Chester Walker and Wilt Chamberlain are among the original members of the class; Walker is a named plaintiff, and Chamberlain specifically authorized institution of the lawsuit. The Walker and Clifford Ray objections were filed on June 8th. Chamberlain's objection was filed on June 7th. No affidavit reciting any factual support for the objections was filed by any of the objectors.

Ray began a player career in NBA basketball in the 1971–72 season. In 1972–73, he signed a four-year plus option-year contract with Chicago. Before the 1974–75 season, he was traded to the "Golden State Warriors" and signed with that team a two-year, plus a one-year option, no-cut contract for $175,000. The two-year term of his contract has been completed and the one-year option (1976–77 season) is at hand.

Chester Walker played in the NBA from the 1962–63 through the 1974–75 seasons. Walker was the Chicago team player representative for the 1970 and 1971–72 seasons.

In September, 1974, Walker signed a one-year plus one-year option contract with Chicago for $165,000. He played for Chicago in 1974–75, and in September, 1975, was tendered a contract for at least the $165,000 salary level for 1975–76. He and Chicago apparently could not settle their differences, and he has not played since.

Walker filed an antitrust action in Philadelphia in January, 1976. That action was enjoined by court order and memorandum dated February 26, 1976. On May 28, 1976, Walker unsuccessfully sought to have the hearing on the settlement agreement postponed from June 23, 1976 to permit discovery. The motion was denied by endorsement dated June 16, 1976, because Walker has had access since 1970 to the entire file accumulated by plaintiffs' counsel; "much of the information [sought] is open to him in the Stipulation and Settlement Agreement" and the attached exhibits, *id.*, p. 2; and because it was evident that Walker had not availed himself of "what is virtually a storehouse of available discovery prior to" filing his motion.

Wilt Chamberlain's NBA playing career began in the 1959–60 season and he played until the end of the 1972–73 season. His last contract was a two-year contract calling for $430,000 in salary in 1971–72, and $450,000 in salary in 1972–73 plus forgiveness of a $67,000 loan, and a one-year option. In 1973, he was enjoined from signing a contract to play with an ABA team in 1973–74, his option year. In arbitration of the dispute, the arbitrator ruled in favor of the Los Angeles club which meant that Chamberlain either had to play for Los Angeles or sit out the option year. He chose to sit out the year.

Ray and Walker object to the certification of the class under Rule 23(b)(1), and argue that this is properly a Rule 23(b)(3) class. They claim that the settlement is inadequate and unfair since (1) the proposal modifies rather than completely eliminates the college draft; (2) reserve compensation is not eliminated immediately; (3) a team by retaining a right of first refusal, has the opportunity to keep a player on its roster;

and (4) the $4.3 million settlement fund for the players is insufficient, and its proposed allocation unfair. Wilt Chamberlain's objection is that the settlement's covenant not to sue provision may bar Chamberlain's damage claim pending in the Central District of California, in which further prosecution is enjoined pending disposition of this litigation.

At the settlement hearing on June 23, counsel for the three objectors presented their arguments. Counsel for Ray and Walker focused primarily on objections to Rule 23(b)(1) class certification and on the right of the objectors to have the court's determination of the settlement postponed to allow the objectors the opportunity for discovery on the bona fides of the settlement. Counsel for Chamberlain indicated that his concern was that the settlement might be a barrier to Chamberlain's suit against the NBA. He had no other objection to the settlement.

Walker was present and testified. The burden of his testimony was that he had been a player representative and therefore a named plaintiff during much of the history of this litigation; that he had been kept fully advised of the progress of the litigation, had received notice of the proposed settlement and its terms, and that he objected to the settlement personally.

*Determination*

■ 1. Before evaluating the merits of the proposed settlement, the Walker and Ray opposition to the Rule 23(b)(1) class certification must be considered. The class was certified in an opinion filed on February 14, 1975, *Robertson*, 389 F.Supp. 867. Notice that the class had been accorded Rule 23(b)(1) certification was mailed to all members of the class including Walker and Ray on September 19 and 22, 1975. The reasons for certifying the class as a Rule 23(b)(1) action were fully canvassed in that opinion (*id.*, at 896–903), and need not be repeated here. No member of the class voiced any objections to such certification until June 8, 1976, when the issue surfaced in the Walker-Ray memorandum arguing

against the proposed settlement. The contention that certifying the class under Rule 23(b)(1) rather than pursuant to Rule 23(b)(3) was in error does not controvert in any way the merits of any of the terms of the proposed settlement, and comes too late to warrant a reconsideration of the merits of the class certification. No issue of due process is involved. All class members including Walker and Ray were kept fully informed of the progress of the litigation and the terms of the settlement. The objectors have appeared through counsel and in Walker's case, in person, to articulate their objections. All have had their day in court, and their rights, therefore, have been fully preserved. *See Hansberry v. Lee*, 311 U.S. 32, 42–43, 61 S.Ct. 115, 85 L.Ed. 22 (1940); *American Employers' Insurance Co. v. King Resources Co.*, Civil No. 3908 (D.Colo., April 10, 1975). Accordingly, insofar as the objectors are moving to decertify the class under Rule 23(b)(1), the motion is denied.

■ 2. In evaluating the terms of a proposal to settlement in a class action, the court must determine whether, taken as a whole, it is so unfair as to preclude judicial approval. *Glicken v. Bradford*, 35 F.R.D. 144 (S.D.N.Y.1964). While seeking to effectuate public policy favoring the voluntary out-of-court settlement by the parties of disputes in litigation, the court must be satisfied that the settlement fully protects the rights and interests of absent members of the class. *Feder v. Harrington*, 58 F.R.D. 171 (S.D.N.Y.1972); *Zerkle v. Cleveland-Cliffs Iron Co.*, 52 F.R.D. 151 (S.D.N.Y. 1971). The settlement hearing is not " 'a trial or a rehearsal of the trial,' " *Saylor v. Lindsley*, 456 F.2d 896, 904 (2d Cir. 1972), *quoting*, Haudek, *The Settlement and Dismissal of Stockholders' Actions—Part II: The Settlement*, 23 Sw.L.J. 765, 771 (1969). The function of the court is to canvass the relevant factors necessary to render an informed judgment as to the fairness, reasonableness, wisdom and adequacy of the proffered termination of the action. *West Virginia v. Chas. Pfizer & Co.*, 314 F.Supp. 710, 740 (S.D.N.Y.1970), *aff'd*, 440 F.2d 1079, 1086 (2d Cir. 1971), *aff'd*, 404 U.S. 548, 92

S.Ct. 81, 30 L.Ed.2d 115 (1972). It does not attempt to decide the merits of the controversy. *Ibid.; United States v. Allegheny-Ludlum Industries, Inc.,* 517 F.2d 826, 849 (5th Cir. 1975).

■ The case has been very hard fought. Extensive discovery in preparation for trial has been accomplished. The underlying legal issues have been fully briefed and argued and tentative determinations in respect to some of these issues have been made by the court. By the time negotiations for settlement began, each side had a clear grasp of all the facts supportive of the opposing side's contentions. Each party was fully aware that the legal questions involved were highly complex. The plaintiffs contend that various NBA practices in re contracting for player services and according the exclusive right to contract for those services to particular clubs violate the federal antitrust laws. Defendants assert the lawfulness of these practices and contend that they have become fixtures in the NBA through the collective bargaining process and are hence exempt from the reach of the antitrust laws. Both parties express confidence that the facts fully support their respective positions, but both recognize that the risks are great and that each could lose much if the matter proceeds to trial.

There are risks to the class of establishing liability absent a convincing showing that the disputed practices constitute a *per se* violation of the Sherman Act. *See Klor's, Inc. v. Broadway-Hale Stores, Inc.,* 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959); *United States v. Sealy, Inc.,* 388 U.S. 350, 87 S.Ct. 1847, 18 L.Ed.2d 1238 (1967). Even, however, assuming that such liability is established, the outcome of *Kapp v. National Football League,* C–72–537 (W.D.Calif. jury verdict on April 2, 1976), where a jury refused to award damages to plaintiff Kapp after the court had ruled that certain practices of the NFL were illegal as a matter of law, strongly suggests

that there is no certainty that plaintiffs will succeed on their damage claims.

Under the settlement, a fund of 4.3 million dollars is to be divided among the members of the class, and the NBA has undertaken to pay what is roughly one million dollars in fees and disbursements to class counsel. Ordinarily class counsel's fees and expenses are paid out of the settlement fund or by assessment of members of the class. Thus, the settlement fund is actually more than 5 million dollars. While the NBA appears to be in sound financial condition, the payroll consumes a considerable portion of the income of each member club. The economic hazards of member clubs making a profit are underscored by the fate of the American Basketball Association, the NBA's rival league. That league has folded and only four of its teams, now in agreement to be merged with the NBA, are viable franchises. Under the circumstances, the financial aspects of the settlement seem a reasonable exaction from defendants for the price of peace. Given the risk to the class attendant upon establishing liability and convincing a jury that professional basketball players, who are currently earning extremely high salaries, should be awarded money damages from the NBA, a 5 million dollar settlement fund seems certainly a reasonable compromise which the class can accept as a wise alternative to the risks of a trial on the merits. *See City of Detroit v. Grinnell Corp.,* 495 F.2d 448, 463 (2d Cir. 1974).

The settlement effectuates a radical modification of the disputed practices in respect of the college draft and options for future services. In addition, there will be a phasing out of the reserve compensation rules, arbitration of disputes, a covenant by the class not to sue, appointment of a Special Master to supervise and enforce the settlement agreement, and retention of jurisdiction by the court to assert final authority in the enforcement of the settlement terms.[1] These terms come to grips with plaintiffs'

1. After the hearing on the proposed settlement of this case, but before final approval by the court, a dispute arose between the players and

the NBA concerning the proper interpretation of some of the terms of the settlement. A letter agreement, a copy of which is on file with

objections enumerated in the lawsuit, while at the same time seeking to accommodate defendants' contentions that some restrictions or restraints are essential for the survival of the NBA as a viable organization able to field teams that offer truly competitive sports exhibitions.

The settlement avoids a trial of uncertain duration, but it is clear that the trial would be lengthy. A trial limited to the question of liability would consume two months at a minimum. The length of the damage phase of the trial in which each of the 479 members of the class would have to establish the extent to which he had been damaged is difficult to estimate, but I am confident that that phase of the case would continue far in excess of two months of trial time.

Of the 479 members of the class only three objections against the settlement have been filed. The manner in which the settlement was reached—by arm's length negotiations in which a representative group of class members actively participated—and the care taken throughout the history of this litigation to keep all members of the class fully apprised of developments, insured that all class members understood what class counsel was doing, and enabled each member of the class to make an intelligent assessment of the merits of the compromise proposed. Based on these facts, the court can confidently conclude that the filing of only three objections is an unquestionable indication of almost unanimous support for the proposal from members of the class.

Chamberlain does not object to the settlement as long as his rights to continue his litigation remain unaffected by the class covenant not to sue. Determination of that question is dependent upon the nature of the Chamberlain lawsuit and the extent to which it raises issues distinct and apart from those presented in this litigation. *See Robertson*, 413 F.Supp. 88. Resolution of that question may require a full hearing and consideration. On the basis of the facts before the court at the time Chamberlain was enjoined from proceeding further with his lawsuit in California, it was held that the *Chamberlain* litigation tracked the claims raised in the instant case. *Id.* In any event, this court will give Chamberlain a full opportunity to show that his claims are not so related, and insofar as a convincing showing to that effect is made, he will be entitled to pursue his litigation independently.

The objections of Ray and Walker that the settlement cannot be approved until they have been given an opportunity for discovery on the merits of the settlement are misplaced. The status of discovery is a factor which the court must take into account in evaluating a class settlement proposal. The discovery referred to in the cases, however, is the extent to which discovery has been obtained so that the court and class counsel are in position to make a rational and informed evaluation of the complexity, expense, likely duration of the trial, the probability of success in a trial on the merits and the reasonableness of the settlement in light of those attendant risks. *See City of Detroit v. Grinnell, supra; Newman v. Stein,* 464 F.2d 689 (2d Cir.), *cert. denied,* 409 U.S. 1039, 93 S.Ct. 521, 34 L.Ed.2d 488 (1972). There is no require-

the court, was drafted by the parties reflecting an interpretation of these terms that is mutually satisfactory and which coincides with the court's understanding of the demands of the antitrust laws. As set forth in the agreement and clarified by the letter of understanding dated July 26, 1976, between 1976 and 1986, rookies subject to the college draft, under ordinary circumstances, become subject to exclusive right of negotiations of the drafting club only if by September 15, following the initial draft, they have been tendered: (1) a contract of one year at least at the applicable minimum salary, with a one-year option of renewal at the same salary, or (2) a four-year contract of $375,000 over the term, with $120,000 guaranteed, or (3) a five-year contract of $500,000 with $165,000 guaranteed. If the club does not make such a required tender by September 15th following a draft, the player is a free agent and can negotiate with any team. If such a tender is made, the player must sign with the club on whatever terms he can arrange or sit out for one year. A rookie who sits out for one year is subject to draft a second time. A rookie who elects to sit out two seasons becomes a free agent.

ment that every objector be allowed to have discovery concerning the settlement itself so that he can personally assure its reasonableness. Such a course would mean that few settlements would be approved, since each member of the class would have the right to keep it open until satisfied as to its bona fides. In this connection, a quote from Judge Moore's opinion in *City of Detroit v. Grinnell Corp., supra,* at 464 is particularly apposite:

> "To allow the objectors to disrupt the settlement on the basis of nothing more than their unsupported suppositions would completely thwart the settlement process. On their theory no class action would ever be settled, so long as there was at least a single lawyer around who would like to replace counsel for the class and start the case anew. To permit the objectors to manipulate the distribution of the burden of proof to achieve such an end would be to permit too much."

*See, Saylor v. Lindsley, supra.*

Walker and Ray object to the method of distribution on the ground that as higher salaried players their share should exceed that of a player making less than they. There has been no indication during the course of the suit that the higher-salaried players have been more severely injured. Moreover, the method adopted seems a more democratic and a more equitable division among members of the class.

The remaining objections have been adequately disposed of in the discussions of the factors warranting court approval of the proposed disposition of this litigation. The proposed settlement constitutes a negotiated compromise which fairly seeks to protect the interests of both the players and the club owners. It should make for an era of peace and stability in professional basketball for many years to come.

Accordingly, the settlement is approved. It is SO ORDERED.

