Junior BRIDGEMAN, David Robinson, Armon Gilliam, Reggie Williams, Jose Ortiz, Rory Sparrow, Darrell Walker, Phil Hubbard, Ken Barlow, and National Basketball Players Association, on behalf of themselves and all class members, Plaintiffs,

v.

NATIONAL BASKETBALL ASSOCIATION, Atlanta Hawks, Ltd., Boston Celtics Limited Partnership, Capital Bullets Basketball Club, Inc., Chicago Professional Sports Limited Partnership, Dallas Basketball Limited, Denver Nuggets Entertainment Co., L.P., Detroit Pistons Basketball Co., Golden State Warriors, A California Limited Partnership, Houston Rockets Pro Basketball Club Ltd., Jazz Basketball Investors, Jerry H. Buss, d/b/a California Sports and the Los Angeles Lakers, Kings Professional Basketball Club, Inc., LAC Basketball Club, Inc., Meadowlands Basketball Associates, t/a New Jersey Nets, Milwaukee Bucks, Inc., National Advertising Service, Inc., Cleveland Cavaliers Division, New York Knickerbockers Basketball, a division of Madison Square Garden Center, Inc., Pacers Basketball Corp., The Philadelphia 76ers Basketball Club, Inc., Phoenix Professional Basketball Club, Ltd., Pro Basketball, Inc., Seattle Supersonics, Inc., Spurs Professional Basketball Club, Ltd., Defendants.

In re Chris DUDLEY.

Civ. A. No. 87–4001.

United States District Court,
D. New Jersey.

Oct. 27, 1993.

---

**18.** The patter technique involves combining mo-     notonic repetition of sixteenth notes.

Lowenstein, Sandler, Kohl, Fisher & Boylan by Gerald Krovatin, Roseland, NJ, Weil, Gotshal & Manges by Bruce S. Meyer, New York City, for Bridgeman Class.

Proskauer Rose Goetz & Mendelsohn by Kathleen M. McKenna, Clifton, NJ, Proskauer Rose Goetz & Mendelsohn by Howard L. Ganz, Steven C. Krane, Francis D. Landrey, Wendy H. Schwartz, New York City, for Nat. Basketball Ass'n.

Lowenstein, Sandler, Kohl, Fisher & Boylan by Gerald Krovatin, Roseland, NJ, Bredhoff & Kaiser by George H. Cohen, Robert M. Weinberg, Andrew D. Roth, Washington, DC, Simon P. Gourdine, New York City, for Nat. Basketball Players Ass'n.

Andrews & Kurth by Michael T. Williams, Walter L. Stratton, Los Angeles, CA, Lowenstein, Sandler, Kohl, Fisher & Boylan by Gerald Krovatin, Roseland, NJ, for Chris Dudley.

McCarter & English by Lanny S. Kurzweil, Newark, NJ, Foster Pepper & Shefelman by David B. Howorth, Portland, OR, for Trail Blazers, Inc.

Grotta, Glassman & Hoffman by Stanley L. Goodman, Roseland, NJ, Katten Muchin & Zavis by Brian W. Bulger, Chicago, IL, for The Chicago Bulls.

## OPINION

DEBEVOISE, District Judge.

On September 7, 1993 Merrell E. Clark, Jr., Esq., Special Master under the Settlement Agreement in this case (the "Bridgeman Settlement Agreement" or "BSA"), issued his Report § 28 in which he found "that (1) a multiyear contract with a one-year out is not *per se* cap circumvention and (2) Arti-

174

cles VI and VII of the BSA contemplate that there may be player options in multiyear contracts to lengthen or shorten the contracts." The Special Master also dismissed the National Basketball Association's ("NBA") claims that a contract between the Portland Trail Blazers ("Portland") and player Chris Dudley constituted cap circumvention and that the parties to that contract had a forbidden unwritten understanding concerning future renegotiation of that contract.

On September 12, 1993 the NBA filed Objections to the Special Master's Report. The National Basketball Players Association ("NBPA"), the Bridgeman Class, Chris Dudley ("Dudley"), Portland and The Chicago Bulls filed papers in opposition to the Objections.

At the conclusion of the final hearing before the Special Master on August 30, 1993 the NBA raised a new contention, namely, that if a one-year out has value, then that value should be added to the player's salary for purpose of computing whether the salary cap is exceeded. For reasons which will be noted later in this opinion the Special Master concluded that the contention was not relevant to the Portland/Dudley case but that it was relevant to one-year out contracts generally and in particular to contracts between the Atlanta Hawks and Craig Ehlo and The Chicago Bulls and Toni Kukoc. The Special Master scheduled a further hearing on that issue and on September 24 he heard argument and received documentary evidence.

On September 28 the Special Master issued his Report # 29 in which he concluded that a one-year out is not "compensation" under Article VII, Part A, Section 1(C) and that if the court should ultimately conclude that the value of one-year outs in multiyear contracts should be added to salary for salary cap purposes, the NBA should apply such rule only *in futuro* and not to the contracts between Atlanta and Ehlo and Chicago and Kukoc.

On October 5, 1993 the NBA filed Objections to Report # 29. All the parties agreed that the Objections to both Report 28 and Report 29 would be dealt with at the October 12, 1993 hearing which I had scheduled. The

hearing was held and this constitutes my findings of fact and conclusions.

## I. *The Facts*

The rights and obligations of the parties are set forth in the BSA, a comprehensive agreement settling this case arrived at after extensive negotiations. The Collective Bargaining Agreement "CBA" contains the same terms. Under the BSA a player can become a free agent after four years in the NBA; an initial salary can be increased by 30% of the initial amount each year of a contract; a team can re-sign one of its own players upon the expiration of his contract without regard to the salary cap, but all other teams are subject to the salary cap provisions; there can be no renegotiation of a contract during its first year.

Some contracts contain provisions granting the player an option to terminate his contract, at which time the player becomes a free agent. An option to terminate a multiyear contract after one year has been referred to in these proceedings as a "one-year out" provision.

The events which gave rise to proceedings before the Special Master are set forth succinctly in his Report as follows:

Chris Dudley is a six-year veteran player who completed a three year contract with the New Jersey Nets on June 30, 1993. His salary last year was $1,200,000. He has been a valuable player, but not a starter.

Dudley played as a back-up center for New Jersey and aspired to become a starting center on a championship caliber team.

Prior to July 1, 1993, while still under contract to New Jersey, Dudley and his agent Dan Fegan had negotiations with that team for a new contract. New Jersey was not limited by the salary cap with respect to Dudley and made him an offer of a seven-year contract with six years fully guaranteed and the seventh year partly guaranteed.

The proposed salaries were as follows:

| | |
|---|---|
| 1993–94 | $ 1,560,000 |
| 1994–95 | 2,028,000 |
| 1995–96 | 2,496,000 |
| 1996–97 | 2,964,000 |
| 1997–98 | 3,432,000 |
| 1998–99 | 3,900,000 |
| 1999–2000 | 4,368,000 |
| Total | 20,748,000 (Ex. 7) |

Dudley's agent, Fegan, had made a study of salaries for starting centers in the NBA (Ex. 12), and he and Dudley concluded that the offer was not sufficient for someone of Dudley's skills and playing time. The offer was then withdrawn by New Jersey, although there is evidence that it, or something close to it, would have been available if Dudley had showed serious interest in it.

Fegan continued to have conversations with New Jersey, but for whatever reason no further offer was received.

Fegan had some talks with Phoenix, a championship caliber team, which had room under its salary cap for a six-year contract averaging $3,307,000 per year, but no firm offer was received. There were also some conversations with Detroit, but no offer resulted.

In the meantime, and beginning on July 1st or 2nd, negotiations had begun with Portland. This team was particularly attractive to Dudley because it was of championship caliber, it had no natural center, it played a style of basketball that he thought would "showcase" his skills and it was located on the West Coast where he lived. (Tr. 533)

The problem was that Portland had no room under its salary cap. Portland has had an exceptional record over the last four years—three Western Conference Championships and two NBA finals—and was not willing to remove any highly paid stars from its roster. It was willing to trade a lesser player and open up a $790,000 slot. In view of Dudley's negotiations with New Jersey and Phoenix, however, a contract starting at $790,000—without more—would be of no interest to him. Geoffrey Petrie, the man in charge of Portland basketball operations, explained the situation to his superiors in a memorandum dated July 2, 1993 and suggested "putting an opt out into the long-term contract at $790,000." (Ex. 6) Such an opt-out would give Dudley the right to become a free agent again after one year. If he did opt out, Portland would be able to pay him without regard to the salary cap.

Dudley and Fegan met the Portland management; they were given the royal treatment; they were shown around the city; they met the owner, Paul Allen, and visited his yacht and new home; they liked what they were told about the team's style of play and the skills of its players which were said to complement Dudley's skills. Although they were given no assurances about Dudley's player status, they were optimistic that he would be the starting center because Portland had no other natural center.

On August 3, 1993 Dudley and Portland entered into a seven-year fully guaranteed contract for annual salaries as follows (representing an initial salary of $790,000 and thereafter the 30% annual increases permitted by the salary cap):

| | |
|---|---|
| 1993–94 | $ 790,000 |
| 1994–95 | 1,027,000 |
| 1995–96 | 1,264,000 |
| 1996–97 | 1,501,000 |
| 1997–98 | 1,738,000 |
| 1998–99 | 1,975,000 |
| 1999–2000 | 2,212,000 |
| Total | $10,512,000 |

The salary was only half of the salary which New Jersey had offered in late June, but there was an important, additional provision—a one-year out.

The NBA challenged the Dudley contract on the grounds that (i) by its terms it constitutes cap circumvention under Article VII, Part H, Section 3 of the BSA and (ii) the circumstances reflect an unwritten understanding concerning future renegotiations of the contract in violation of Article VII, Part H, Section 4(a)(2) of the BSA.

In July 1993 the NBA had raised the issue of the propriety of one-year outs in multiyear contracts before the Impartial Arbitrator under the CBA in connection with a contract which Craig Ehlo had entered into with the Atlanta Hawks and a contract which Toni

Kukoc had entered into with the Chicago Bulls. The NBA contended that such options were impermissible amendments to the Uniform Player Contract under the CBA.

The NBPA argued that, by virtue of provisions both of the CBA and the BSA, the dispute should be referred to the Special Master. In his July 29, 1993 opinion the Impartial Arbitrator ruled that: "The Special Master must, in the Arbitrator's opinion, be accorded [an] opportunity to address [the issue of what significance, if any, the cited provisions of Articles VI, and VII have for the question whether the contract clauses at issue are allowable Uniform Player Contract amendments]."

By letters dated July 30 and August 2, 1993 the NBPA requested the Special Master to address the jurisdictional issue and also the issues which the NBA had raised. By letter dated August 6, 1993 the NBA commenced a proceeding before the Special Master seeking remedies for an alleged violation of the CBA and BSA by Dudley and Trail Blazers in agreeing to the multiyear contract with the one-year out option for Dudley. By agreement the Special Master was to hear the Kukoc and Ehlo matters as well as the NBA claims concerning the Portland/Dudley contract. However, the proceedings to date and Report # 28 have developed the facts only as they relate to the Dudley contract.

The parties took discovery in the form of depositions and production of documents. The Special Master held a hearing on the merits on August 25 and 26, 1993 limited to the Dudley contract, at which time witnesses were heard and documents received in evidence. On August 30, 1993 the Special Master heard oral argument. He issued his Report # 28 on September 7, 1993. After a further hearing he issued his Report # 29 on September 28, 1993.

## II. *The Special Master's Decision*

In Report # 28 the Special Master defined the issues to be decided by him as follows:

1. Does a multiyear contract with a one-year out, the exercise of which will make the player a free agent, constitute *per se* cap circumvention?

2. Do Articles VI and VII of the BSA contemplate that there may be player options in multiyear contracts to lengthen or shorten the contracts?

3. In the circumstances of this case, does the Dudley/Portland contract constitute cap circumvention under Article VII, Part H, Section 2?

4. In the circumstances of this case, was there an unwritten understanding concerning future renegotiation of Dudley's contract with Portland in violation of Article VII, Part H, Section 4?

Before summarizing the salient points of the Special Master's decision it would be useful to set forth certain of the BSA provisions upon which the parties rely.

Article VII of the BSA, Parts A–G, contains detailed, complex provisions governing team salaries, the salary cap and minimum team salaries. Insofar as is relevant here these provisions require the NBA to pay its players, annually and on a league-wide basis, an amount equal to 53% of the NBA's revenues in aggregate salaries and benefits. They require that each team's total payroll exceed a fixed "Minimum Team Salary". The amount each team can pay in any given year in total salaries is limited to a "Maximum Team Salary" or "Salary Cap". The purpose of the Salary Cap is to preserve team competition throughout the entire league by preventing the richest teams from taking the bulk of the best players to the disadvantage of less well-situated teams. There are certain exceptions to the Salary Cap not relevant here; the exception which is relevant is the one which permits a team to re-sign its own veteran player after his contract with that team has expired without regard to the Salary Cap.

The term "Salary" is defined in Article VII, Part A, Section 1(c) as follows:

(c) "Salary" shall mean the compensation in Money, Property, Investments or anything else of value to which an NBA player (including a player whose contract has been terminated in accordance with the NBA's waiver procedure) or a person or entity designated by a player is entitled in

accordance with a Player Contract, but not including Benefits.

Article VI deals with option clauses. Section 1 permits only one kind of carefully defined option clause in favor of a team. That Section further provides, however, that "[a]ny Player Contract may contain an option in favor of the player."

Article VII, which deals with the Salary Cap, among other things, refers specifically to a player option to shorten a contract. In Section 2(a) of Part B (which concerns signing bonuses) it is stated: "If a Player Contract provides for an option by the player either to increase or *shorten* the stated term of the Player Contract, with the player to receive any form of consideration in connection either with the exercise or non-exercise of any such option, then such consideration shall at all times be deemed a signing bonus...." (Emphasis added).

The Dudley contract was within the literal terms of the foregoing provisions. He was a free agent, permitted to negotiate and enter into a contract with any of the teams. The compensation provisions were within the Salary Cap requirements in that Portland had "room" to pay him $790,000 during the first year of the contract and the annual increments in each of the following six years were 30%. The one-year out was an option to shorten the stated term of his contract.

Charging "salary cap circumvention", the NBA contends that a "below market" contract violates Section 3 of Article VII, Part H when (i) the team has insufficient Room to pay the free agent his market value and (ii) when the team "deliberately includes in the contract a device (such as an early termination provision exercisable after the first year) enabling that team to escape the limitations that its lack of Room imposes." (NBA's Reply Brief at 12). Section 3 reads:

3. Neither the parties hereto, nor any Team or player shall enter into any agreement, Player Contract, Offer Sheet or other transaction which includes any terms that are designed to serve the purpose of defeating or circumventing the intention of the parties as reflected by (a) the provisions of this Article VII with respect to Defined Gross Revenues, Salary Cap and Minimum Team Salary and (b) the terms and provisions of this Stipulation and Settlement Agreement.

The NBA also contends that the circumstances "plainly demonstrate the commonality of understanding between Dudley and Portland that Dudley would terminate the contract after one year and that Portland would then proceed to enter into a new contract with Dudley that paid him a sum more commensurate with his actual value" (NBA's Brief at 33), all in violation of the prohibition against undisclosed agreements contained in Section 4 of Article VII, Part H. Section 4 reads:

4. (a) At the time a Team and a player enter into any Player Contract, or any renegotiation, extension or amendment of a Player Contract, there shall be no undisclosed agreements of any kind, express or implied, oral or written, or promises, undertakings, representations, commitments, inducements, assurances of intent, or understandings of any kind, between such player and any Team:

(1) involving consideration of any kind to be paid, furnished or made available to the player, or any person or entity controlled by or related to the player, by the Team or Team Affiliates either during the term of the Player Contract or thereafter; or

(2) concerning any future renegotiation, extension, or amendment of the Player Contract.

The Special Master ruled preliminarily at the August 16, 1993 hearing on the first two issues which he had defined. He reaffirmed those rulings without discussion in his Report. Those rulings are: (i) a multiyear contract with a one-year out was not *per se* cap circumvention and (ii) Articles VI and VII of the BSA contemplate that there may be player options in multiyear contracts to lengthen or shorten the contracts. None of the parties have challenged those rulings.

The Report next addresses NBA's Section 3 Salary Cap circumvention charge, phrasing NBA's contention as follows: "... a gross discrepancy in salary below a player's 'market value' (as determined in this case by

Dudley's salary of $1,200,000 and the New Jersey offer of $1,560,000) constitutes without more a cap circumvention under Section 3.... [A team] should not avoid the cap by paying a low salary for one year, allowing the player to opt out and then negotiate a new salary free of the cap." (Report at 11).

The Special Master first distinguished Judge Carter's decision in *Matter of National Basketball Association,* 630 F.Supp. 136 (S.D.N.Y.1986) ("*Albert King* case"), in which the court held that the contract in question constituted cap circumvention. The Report recites the substantive benefits to each of the parties to the Dudley contract, noting that during the first year Dudley can receive no more than the sum to which he agreed, which is about half of what he could have received elsewhere. Unlike the contract challenged in the *Albert King* case, which simply re-labeled payments found by the arbitrator to be in violation of the Salary Cap, "[t]he [Dudley] contract is an entirely new deal which may or may not ultimately result in more money than the player might have received had he signed with New Jersey or Phoenix." (Report at 14).

In support of his conclusion that the circumstances of the Dudley contract do not constitute a violation of Section 3, the Special Master noted the following: (i) the BSA contemplates options in favor of a player to shorten a contract and (ii) the NBA has approved numerous contracts containing player opt-out options after two years in multiyear contracts and after one year in two year contracts. The Special Master could not find "that a one-year out in a contract of more than two years is so different in substance as to constitute cap circumvention." (Report at 14).

The Special Master found that the salary cap contributes to the League's financial stability and puts the teams on a more equal footing so far as bidding for players is concerned. However, he also found that contracts with one-year out provisions do not pose a threat to these benefits, and "[o]nly the future will tell us whether taken all together such contracts raise salaries in the long run." (Report at 15).

The Special Master ruled that the fact that a player accepts a salary half as big as he might have gotten in order to have the right to go to market a year later does not constitute cap circumvention, noting that while Portland, in the case of Dudley, will be able to pay him any amount free of the cap, that was the same situation Dudley was in on July 1, 1993. Viewing the situation after the Dudley contract runs for a year from the perspective of each party, the Special Master stated, "[t]he threat to the salary cap from Portland appears to me to be no different than the threat was from New Jersey or from any other team wanting to re-sign its own player." (Report at 15).

Upon the basis of all those considerations the Special Master ruled that "absent any secret understanding of the kind prohibited by Section 4, the Dudley/Portland contract does not violate Article VII, Part H, Section 3 of the BSA." (Report at 15, 16).

As to the charge that Dudley and Portland had violated the Section 4 prohibition against undisclosed agreements, the Special Master stated the NBA's position as follows: "The NBA contends that there exists a secret understanding in violation of Section 4 between Dudley and Portland to the effect that he will opt out after one year and that Portland will through renegotiation of his contract ' "make up" the loss suffered by Dudley by providing him with compensation in that new contract that reflects what the offer he rejected clearly suggests is his true value.' "

The Special Master rejected both of the grounds which the NBA advanced in support of its contention.

The NBA had argued that in light of the other radically better offer or offers made to Dudley, there could only be one reason why he accepted the lower Portland offer—an understanding that after a year, Portland would make up the difference. Responding to that contention the Special Master stated: "I do not find the suggested inference compelling. As indicated above, the explanations given by Dudley for accepting the Portland offer are to me reasonable and plausible in view of his circumstances and career ambitions. The opportunity to be a starting center, plus his 'fit' into the Portland style of

play, plus Portland's championship caliber, plus the team's location on the West Coast, plus the one-year out with its opportunity to be rewarded for a good playing year—all these fully explain his acceptance of the contract without any secret understanding as to future compensation." (Report at 17).

The NBA also relied on the testimony of Richard Dozer of the Phoenix Suns to establish a secret agreement. According to Dozer he had a telephone conversation with Dudley's agent, Daniel Fegan, on July 16, 1993. Dozer testified that he told Fegan that he did not see how Portland could "get anywhere the numbers that Mr. Dudley was looking for" because of the salary cap. According to Dozer, Fegan "responded by saying that Portland was willing to take that slot, whatever it became between 650 and a million, ramp it up 30 percent per year, and have an out-clause after the end of the second year or the first year, if NBA would approve it, and at that point in time Portland had agreed that they would renegotiate the contract and give him the amount of money that they were originally requesting." (Tr. 484). On cross-examination Dozer stated that he was not quoting Fegan directly, reaffirming prior deposition testimony that Fegan had "inferred" that there was such an agreement and that he, Dozer, was "paraphrasing".

Based on his evaluation of the testimony of all the witnesses, and on inferences to be drawn from all the circumstances, the Special Master concluded that it was "unlikely that Fegan said anything like 'Portland had agreed that they would renegotiate the contract and give [Dudley] the amount of money that they were originally requesting.'" Whether or not Fegan made the statement which Dozer attributed to him, the Special Master found as follows:

Based upon the demeanor of the witnesses, the conduct of the negotiations, the logic of the situation and all the other circumstances, I conclude that the existence of such an agreement has not been established. I accept the testimony of the Portland witnesses as truthful and credible, and I accept Dudley's in the same way.

(Report # 28 at 18). Thus the Special Master concluded that there was no agreement

or understanding in violation of Article VIII, Part H, Section 4.

Report # 28 dealt briefly with one other matter which later became the subject of Report # 29. In its closing argument on August 30, 1993 the NBA raised for the first time the contention that:

If as claimed by Dudley, Portland and the Players, the one year out provision had value, then such value should be added to Dudley's salary for salary cap purposes thus putting the Dudley/Portland contract over the cap.

Quite sensibly the Special Master declined to address this new issue, since it had not been adequately briefed and argued. He concluded that in the particular circumstances of the Dudley contract he could determine its validity without regard to the question whether the value of a one-year out provision should be included in the total salary. He stated:

It appears that Mr. Elie, the player whose trade to Houston opened up the $790,000 slot which Dudley filled, also had an option to terminate following the 1993–94 season, in effect a duplicate of Dudley's. Thus if the Dudley option should be added to salary for cap purposes, the total would still be no larger than the slot created by Elie's departure.

Report # 29 addressed the merits of the NBA's contention that the value of a one-year out provision should be added to a player's salary for the purpose of computing whether the salary cap is exceeded. Such a provision appears not only in the Portland/Dudley contract, it also appears in the Atlanta/Ehlo and Chicago/Kukoc contracts.

The Special Master noted the definition of "Salary" in Article VII, Part A, Section 1(c) of the BSA, i.e., "compensation in Money, Property, Investments *or anything else of value* to which an NBA player ... is entitled in accordance with a Player Contract...." The Special Master also recognized that a one-year out in a multiyear contract is a provision that has "value" to a player, the extent of the "value" depending on the circumstances. Nevertheless, he concluded that "the fact that a one-year out has value to

a player does not mean that the value is part of 'salary' as defined in the BSA." The Special Master provided a number of reasons for his conclusion:

First, "salary" is defined as "compensation", and in its ordinary meaning "compensation" does not include the right to terminate a contract.

Second, applying the *ejusdem generis* rule, the general term "anything else of value" is to be limited to the kinds of things which were particularized, namely, money, property, investments.

Third, the BSA contains a number of detailed provisions specifying how elements of compensation are to be treated for purposes of determining salary, e.g., deferred compensation, annuities, signing bonuses. The absence of such provisions with respect to the value of an option to terminate suggests that such options are not to be treated as an element of salary.

Fourth, player contracts contain other clauses which have value to a player, but these values are not added to salary for salary cap purposes.

Fifth, the NBA's prior conduct with respect to options to terminate confirms the conclusion that the value of a one-year out is not to be deemed a part of a player's salary. In the past the NBA approved many player contracts containing options to terminate in favor of the player, and neither the NBA nor anyone else suggested that the value of such options should be included in salary for salary cap purposes.

The Special Master addressed the question of estoppel to assist the parties and the court if, upon review, the court concluded that the value of a one-year out is to be included as part of a player's salary.

The NBPA had contended that the NBA is estopped from making its present contention about one-year outs. The Special Master stated that there was no evidence that prior to August 30, 1993 any teams or players were aware that the NBA might contend that the value of a one-year out in a multiyear contract should be added to the player's salary. Thus Atlanta, Chicago, Ehlo and Kukoc entered into their contracts with no reason to believe that they might be in violation of the salary cap. The teams and the players changed their positions in important ways in reliance on the NBA's long acquiescence in attributing no value to out options for salary purposes. In these circumstances the Special Master ruled that the NBA should apply the rule for which it contended only *in futuro* and not to the contracts already entered into.

The Special Master's decision was:

The one-year out provisions in the Atlanta/Ehlo and Chicago/Kukoc contracts are not "compensation" and no value should be given to them for purposes of computing salary cap compliance.

If the Court should hold otherwise, the NBA should nevertheless be estopped from invalidating the Atlanta/Ehlo and Chicago/Kukoc contracts.

### III. *Decision*

Section 3 of Article XIV of the BSA incorporates the provisions of Fed.R.Civ.P. 53(a), (c), (d) and (e) and provides specifically in subsection (b) that:

(b) the Court shall accept the Special Master's findings of fact unless clearly erroneous and the Special Master's recommendations of relief unless based upon clearly erroneous findings of fact, incorrect application of the law or abuse of discretion.

Applying this standard of review and having considered the parties' submissions and the record, I conclude that the only issue which presents difficulty is whether under the circumstances the Dudley/Portland contract constitutes impermissible salary cap evasion. I can dispose of the other issues summarily.

No party has contested the Special Master's decision on the first two issues which he addressed, namely, (1) A multiyear contract with a one-year out is not *per se* cap circumvention; and (2) Articles VI and VII of the BSA contemplate that there may be player options in multiyear contracts to lengthen or shorten the contracts. I adopt the Special Master's Report #28 on those issues.

As to the fourth issue which Report #28 addressed, the Special Master found that there was no agreement or understanding in violation of Article VII, Part H, Section 4. This required the evaluation of testimony and documentary evidence in order to make a factual determination. Considering the testimony and other evidence the Special Master found that there was not, as the NBA charge, a secret understanding between Dudley and Portland to the effect that he will opt out after one year and that Portland will through renegotiation of his contract "make up" the loss suffered by Dudley by providing him with compensation in that new contract that reflects what the offer he rejected clearly suggests is his true value.

The NBA seeks to avoid the inescapable mandate that I must accept the Special Master's findings of fact unless clearly erroneous. Given the state of the record, the NBA cannot argue that this finding is clearly erroneous. Instead it argues that the Special Master took too narrow a view of Section 4, holding against the NBA because it had failed to prove the existence of some "overt" agreement or understanding. It is NBA's contention that Section 4's prohibition of "assurances of intent, or understandings of any kind" covers the obvious intent of both Dudley and Portland to renegotiate after one year free from the restraints of the salary cap.

This is, in the first place, a departure from the NBA's original contention made before the Special Master. The NBA charged the existence of a specific agreement which, after receiving evidence, the Special Master found had never been made. The NBA has retreated to a charge of a more nebulous "assurances of intent, or understandings of any kind."

It was obvious that Dudley and Portland understood that with a one-year out it was highly probable that at the end of the year Dudley would exercise his option and Dudley and Portland would take advantage of the situation to negotiate a new contract uninhibited by the salary cap. However, that was not an undisclosed agreement of any kind. It was a situation which all the world could see. The NBA saw it and instituted these proceedings. That is not the kind of understanding which falls within the prohibitions of Section 4. Therefore, I adopt the Special Master's Report #28 on the Section 4 issue.

The conclusion in the Special Master's Report #29 that one-year out provisions in multiyear contracts are not compensation and should be given no value for the purpose of computing salary cap compliance is eminently sound. I adopt his Report #29 in toto.

That leaves for more detailed discussion the Special Master's conclusion that the Dudley/Portland contract does not constitute salary cap circumvention in violation of Article VII, Part H, Section 3 of the BSA.

The NBA contends, and the Special Master found, that the salary cap provisions further an important goal. Limiting the amount of money that each team could spend on player salaries enhances the ability of financially weaker teams to compete with the wealthier franchises and thus preserves the health of the entire system for the ultimate benefit of all teams and all players.

Judge Carter, applying comparable provisions in the *Albert King* case, set forth the parallel team and player purposes reflected in the salary cap provisions and the role of the Special Master and the court in implementing those purposes:

> .... Stern stated that financially weak teams were at a competitive disadvantage since they could not offer talented players salaries commensurate with what they could obtain from teams with greater financial resources. The purpose of the Modification Agreement was, in David Stern's words, "to insure the financial stability of troubled NBA teams, improve competitive balance and at the same time preserve and improve the basic framework of the [*Robertson v. National Basketball Ass'n*, 72 F.R.D. 64 (S.D.N.Y.1976)] Settlement Agreement."

630 F.Supp. at 136.

> .... The essential objectives of the players in negotiating the terms of the Modification Agreement were: (i) "to maintain a system of free agency, which, to the great-

est extent possible, would insure that player salaries be established at competitive levels as a result of a free and open bidding system; (ii) to strengthen the long-term financial stability of the league and to protect the jobs of as many players as possible; and (iii) to provide for some form of overall revenue sharing between the players and the NBA teams...."

630 F.Supp. at 137.

The critical underpinnings of the Modification Agreement were the maximum and minimum team salary limitations and the revenue sharing provision. The agreement could not have come into being without those stipulations. The NBA wanted a maximum team salary limitation. The NBPA sought to protect the players from any permanent adverse effects pursuant to the agreed on salary cap with a minimum team salary provision and a revenue sharing mandate. This *quid pro quo* formed the heart of the Modification Agreement. The parties took pains to provide for contingencies and play within these provisions without destroying them.

630 F.Supp. at 139, 140.

The salary cap restriction was an integral part of the bargain to which the NBPA agreed in order to secure revenue sharing for players and a minimum salary floor. The players cannot be allowed to structure salary contracts which, although artifically (sic) and formally within the salary cap limitations, void the provisions designed to protect the NBA's interests. By sanctioning such empty formalism we would buttress the players' interests, but leave the league's (sic) in shambles. This was a two sided agreement when approved in 1983, and the parties entrusted the court with maintaining it as such until termination.

630 F.Supp. at 141.

The NBA quite correctly points out that in an agreement as complex as the BSA, it is quite possible that players and teams could devise ways to defeat the fundamental purposes of the salary cap provisions. Thus Section 3 was incorporated in the BSA. It prohibits agreements and transactions which include terms "that are designed to serve the purpose of defeating or circumventing the intention of the parties as reflected by (a) the provisions of this Article VII with respect to the Defined Gross Revenues, Salary Cap and Minimum Team Salary and (b) the terms and provisions of this Stipulation and Settlement Agreement." It must be noted that the pertinent provisions of Article VII incorporate not only the concept of the "room" within which teams must negotiate salaries but also the provisions recognizing a player's right to receive options to increase or shorten the stated term of the Player Contract.

The NBA argues, correctly I believe, that the Special Master unduly minimizes the adverse effects a one-year opt out will have upon the teams' objective of controlling maximum salaries which can be paid under the BSA.

In his Report # 28 the Special Master observes that although Dudley can become a free agent in one year and Portland can compensate him free of the cap, "that is exactly the situation he was in on July 1 of this year. He was then a free agent, and his team, then New Jersey, could have paid him any amount free of the cap. If he opts out next year, the only change vis-a-vis the salary cap will be that the team which can pay him free of the cap will be Portland instead of New Jersey." (Report # 28 at 14). Continuing, the Special Master stated that "[t]he threat to the salary cap from Portland appears to me to be no different than the threat was from New Jersey or from any other team wanting to re-sign its player." (Report # 28 at 15).

These observations, I believe, overlook the difficulty the NBA has with the one-year opt out. Absent such an option Dudley could contract with only one team for a salary which exceeds the salary cap. If such an option is permissible, there is the potential that Dudley, if he and the teams are willing to wait a year, can negotiate with many or all the teams for a salary in excess of their salary caps. This constitutes a major weakening of the NBA's maximum team salary objective.

It seems to me that the NBA correctly notes that the Special Master too readily

equated the agreements containing options which the NBA approved in the past and the one-year out at issue in the present case. The NBA has approved options after two or more years in multiyear contracts and one-year outs in two year contracts. The Special Master "was unable to accept the proposition that a one-year out in a contract of more than two years is so different in substance as to constitute cap circumvention." (Report #28 at 14).

To me it seems that the length of time before a player can exercise an option can have a substantial impact on the teams' objective of establishing maximum team salaries. If the option cannot be exercised until after the sixth year of a seven year contract the impact would be minimal. If the option could be exercised a month after entering into the contract, the objective of maintaining team maximum salaries would be totally defeated. Lines have to be drawn and it would be a mistake to too readily equate the kinds of options which the NBA has approved in the past and the option at issue here. The impact on maximum team salaries could be quite different.

I do not believe the record supports the Special Master's reflection that: "It does not seem to me, however, that the Dudley contract and others like it pose any threat to [the benefits of a salary cap]." Closer to the mark is his observation that "[o]nly the future will tell whether taken all together such contracts raise salaries in the long run." (Report #28 at 15).[1]

Thus the case is in a posture where the record does not permit a finding about the long range effects of contracts which provide for both a one-year out and a first year salary significantly below what the player could expect to receive absent the one-year out. Many variables enter into the equation. Perhaps some expert could derive an answer. Perhaps only experience will tell.

It is quite possible that the widespread use of such contracts would have a devastating impact upon the teams' salary cap objectives. However, such a conclusion is not self evident, and that being the case it cannot be said that entry into a contract having such terms was "designed to serve the purpose of defeating or circumventing the intention of the parties" as reflected by the salary cap provisions.

A contract such as Dudley's finds authorization in the BSA. As noted above, Article VI, Section 1 provides that: "Any Player Contract may contain an option in favor of the player." Nowhere in the BSA is it specified that one of the options is a right to terminate after a year, but Article VII, Part B, Section 2(a) dealing with signing bonuses recognizes that there may be a player contract which "provides for an option by the player either to increase or shorten the stated term of the Player Contract."

There is nothing which excludes a one year termination option. Other provisions of the BSA suggest that while one year is perhaps the minimum length of time before a contract can be modified or terminated, a one year option is within the contemplation of the parties. Article VII, Part F, Section 7(d) provides:

(d)(1) There may be no renegotiation, extension, or amendment of any kind, of any Player Contract during the first year of the term of the Player Contract.

(2)(i) There may be no renegotiation, extension, or amendment of any kind, of any Player Contract for a period of one year following any renegotiation, extension, or amendment concerning length of term of the Player contract or a change in Salary of more than ten percent (10%) in any year of the Player Contract.

(3) In the case of a Player Contract with a stated term of one season or less, there may be no renegotiation or extension of such contract until its term has expired.

---

1. In a post hearing communication the NBA brought to my attention two multiyear contracts which have been executed recently—a 15 year contract between Golden State Warriors and Chris Weber and a 13 year contract between the Orlando Magic and Anfernee Hardaway. Each, according to the NBA's communication, provided the player with a one-year termination option and each provided for initial salaries far below market value compensation. Since this information was not a part of the record before the Special Master it would be inappropriate for me to consider it at this time.

The NBA correctly observes that upon the exercise of a one-year out option a player once again becomes a free agent, and the team for which he plays can pay him a salary unrestricted by the salary cap. As observed above, this may have the effect of pushing upward maximum salaries which teams can pay; the record does not permit a finding of the extent of this upward movement.

Suffice it to say, there are various provisions in the BSA which result in a departure from a pure salary cap. These provisions are incorporated by reference into Section 3 of Article VII, Part H. That Section forbids only agreements defeating or circumventing the intention of the parties as reflected by "(a) the provisions of this Article VII with respect to Defined Gross Revenue, Salary Cap and Minimum Team Salaries and (b) the terms and provisions of this Stipulation and Settlement Agreement." Regardless of what the consequences of one-year out provisions in multiyear contracts may be vis-a-vis the salary cap, such contracts are within the contemplation of the parties as reflected in the above mentioned provisions of Article VII and the BSA. For these reasons I conclude that even though one-year out provisions in multiyear contracts may have a presently unascertainable adverse effect on the very legitimate objectives of the salary cap, Dudley's contract is not in violation of Section 3.

## IV. *Conclusion*

I will adopt the findings of the Special Master in his Reports # 28 and # 29 except as set forth in this opinion and I will adopt the decision of the Special Master in each of those Reports. An appropriate order follows.